TEXACO, INC., Appellant,

v.

Josephine STANDARD, Administratrix of
Estate of Harvey Standard,
Deceased, Appellee.

Court of Appeals of Kentucky.

Oct. 31, 1975.

Rehearing Denied May 28, 1976.

Robert G. Breetz, Stites, McElwain &
Fowler, Louisville, for appellant.

James T. Robertson, Louisville, for appellee.

JONES, Justice.

A Jefferson Circuit Court jury awarded Josephine Standard, widow and administratrix of the estate of Harvey Standard, judgment of $200,000 against Texaco for the alleged wrongful death of Harvey Standard. The jury apportioned $50,000 for the conscious pain and suffering of Harvey and $150,000 for the alleged wrongful-death claim.

At the close of the evidence offered by Josephine, Texaco moved for a directed verdict. That motion was overruled. At the conclusion of all of the evidence, Texaco renewed its motion for a directed verdict. That motion was also overruled. Final judgment awarding the $200,000 to Josephine Standard, Administratrix, against Texaco was entered May 22, 1972. Texaco filed a timely motion for judgment notwithstanding the verdict and, alternatively filed motion and grounds for a new trial. These motions were overruled on March 22, 1973. Texaco appealed asserting various grounds for reversal. The court, however, is of the opinion that Josephine's evidence was not sufficient to create a submissible jury case. Therefore, this court reverses the judgment with directions to enter judgment in favor of Texaco since it made timely motions for directed verdicts and for judgment n. o. v. It will only be necessary to discuss the

single issue of whether a submissible case was presented.

Harvey Standard was a 37-year-old man who met his death in an industrial accident at General Electric's Appliance Park on December 31, 1968. Harvey had been employed by General Electric for approximately 1½ years. All of this time he worked in Building # 6, first as a janitor and later as a maintenance man. He met his death when gasoline he was using to clean oil from an enclosed broach pit in Building # 6 exploded and caught fire.

General Electric had closed its plant during the Christmas holidays and used that time to conduct a housecleaning of Building # 6. On the day before the fire and explosion, Harvey's foreman assigned him the task of cleaning the broach pit.

The broach is a machine which cuts holes through metal. A part of the broach extends below floor level into a pit approximately 10 to 15 feet square and 7 to 8 feet deep. The pit is covered by a thick piece of metal and ingress and egress is through a trapdoor in the cover, and a ladder into the pit. A cutting oil is used in the operation of the broach and over a long period of time the oil had caused a brown residue to form. Harvey's foreman described the residue as a fungus and testified that the broach had not been cleaned for 18 years. Harvey's assigned task was to remove the residue from the base of the machine and from the walls of the pit. Two other men, William Schroerlucke and Charles Long, were assigned to help him.

Building # 6 is a large building measuring some 600 feet across and some 900 feet deep. The front of Building # 6 faces east and the broach pit is located in the rear near the west wall. Testimony was that two doors are located at the south wall. One of the doors is identified as the front door, and the other the rear door. The distance between these doors is 300 feet. Facilities for storing and obtaining gasoline are outside the front door, and facilities for storing and obtaining kerosene are outside the rear door. Texaco had a contract to supply both gasoline and kerosene to Building # 6. Kerosene was stored in an underground tank which belonged to General Electric and was located outside the rear door. Gasoline was stored in a 1,000 gallon skid tank which was leased by Texaco to General Electric and was located outside the front door. It was an above-ground tank and gasoline was withdrawn by a hand-operated pump. The tank was 8 feet long and had a diameter of 4½ feet. The skid tank, at the time of the explosion and death of Harvey Standard, had no markings other than a decal which contained the word "Texaco." Soon after the explosion and fire some employee of General Electric called the sales agent of Texaco. The sales agent came to General Electric's premises and stenciled on the skid tank in bold letters the word "Gasoline." On the day of the fire Schroerlucke and Long took a five-gallon enclosed can of kerosene and some rags to the broach pit and started Harvey on the job of cleaning the pit. They then left and didn't see Harvey again until around 11 a. m. They all met in the vicinity of the maintenance office. Harvey reported that he had run out of kerosene and asked where he could get more. Schroerlucke, Long, and Harvey were facing the rear of the building. They told Harvey that the kerosene was outside the door, which was identified as the rear door on the south wall. Harvey was told that the kerosene was outside that door and in a red pump marked "Kerosene."

After lunch Harvey was seen by his foreman, Douglas Slaughter. Slaughter was riding a battery-powered motorscooter and he saw Harvey walking toward the broach pit carrying the five-gallon enclosed can. Slaughter gave him a ride on the scooter to the broach pit. As far as the record shows, Slaughter was the last person to see Harvey before the explosion.

The explosion occurred at 12:35 p. m. The five-gallon enclosed container was found on top of the pit, and in the pit a one-gallon, open-top container was found.

Harvey suffered severe burns and was immediately taken to the hospital. On the way to the hospital he lapsed into uncon-

sciousness twice. He died seven hours after his admission to the hospital and never regained consciousness.

The only allegation of negligence on the part of Texaco was its failure to label the skid tank. Josephine contends that since Harvey was not acquainted with Building # 6, instead of going to the rear door where the kerosene was located, he went to the front door where the unmarked gasoline tank was located and obtained gasoline rather than kerosene.

After the explosion General Electric conducted an investigation. The liquids in the five-gallon closed container, the one-gallon open bucket, and samples of the outside gasoline tank and kerosene tank were tested. The tests revealed that, at the time of the explosion and death of Harvey Standard, both the five-gallon safety can and the one-gallon open bucket contained gasoline.

■ There is no proof as to how or where Harvey got the gasoline. There is no testimony as to what ignited the gasoline vapors. In the absence of statute or regulation, Texaco in leasing the gasoline tank to General Electric, had no duty to General Electric or its employees to label the tank. Under the terms of the lease, General Electric had complete control over the tank with the obligation to maintain it. In order that the jury's verdict be sustained in this case the jury would have to resort to a number of possibilities. There is absolutely no proof that the accident was caused by the failure of Texaco to label the tank. Liability must rest on a more solid basis than speculation and surmise.

■ The only negligence shown by the proof is on the part of General Electric. It had the duty to supply the kerosene. Its employees, including Harvey's foreman, knew that Harvey was inexperienced in the task he was performing. Schroerlucke and Long, who were assigned to assist Harvey, were derelict in their respective duties in replenishing the additional kerosene.

■ Prosser in his Handbook of the Law of Torts (4th Ed. 1971) discusses the problem of causation and proof at page 241. He says that the plaintiff in this type of case must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of a defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant.

In a case somewhat similar to the facts in the case at bar, this court said,

"The proof in this case establishes no more than possibilities or combinations of possibilities. We can find no evidence of substance which would even tend to tilt the balance of causation as between an unavoidable accident, a defective condition in the pump house, or negligent activity on the part of appellant's employee. It is pure guesswork that the fire was attributable to the latter and, of course, that is the only conjecture upon which appellant's liability can be based. Since the claimants' proof did not pierce the veil of speculation, appellant was entitled to a directed verdict." *Highway Transport Co. v. Daniel Baker Co.*, Ky., 398 S.W.2d 501 (1966). See also *Savill et al. v. Hodges*, Ky., 460 S.W.2d 828 (1970).

■ Josephine Standard, as administratrix of Harvey Standard, failed to prove any negligence on the part of Texaco. Likewise, there was no evidence as to the cause of the fire and explosion. Texaco was entitled to a directed verdict in its favor. Hence, it was entitled to judgment n. o. v.

The judgment is reversed with directions to enter judgment in favor of Texaco.

All concur, except REED, C. J., not sitting, and CLAYTON, J., dissenting.