**KENTUCKY BAR ASSOCIATION, Movant,**

v.

**James W. CRAFT, Respondent.**

**No. 2006–SC–000258–KB.**

Supreme Court of Kentucky.

Dec. 21, 2006.

## OPINION AND ORDER

On October 12, 2004, the Inquiry Commission of the Kentucky Bar Association issued a charge against Appellee, former Kentucky Bar Association (KBA) member, James W. Craft, whose address is listed as P.O. Box 824, Whitesburg, Kentucky 41858–0824. The charge arises out of his representation of Harold Hurst, et al., in

an action filed in 1985 involving disputed mineral rights and royalties on real estate located in Letcher County, Kentucky, and an escrow account for the royalties contested in said action. The Trial Commissioner's Amended Report, filed on January 25, 2006, found that Craft violated SCR 3.130—1.3 (lack of due diligence), 3.130—1.4(a) (failure to communicate), 3.130—3.2 (failure to expedite litigation), 3.130—1.15(b) (failure to render an accounting).

The Trial Commissioner recommended a six month suspension from the practice of law. Pending disposition of *this matter*, consideration by the Character and Fitness Committee of Craft's petition for reinstatement, previously scheduled for April 17, 2003, has been delayed for nearly four (4) years. Finding the evidence adduced wholly insufficient to support the recommended findings and conclusions, we now dismiss all charges.

## I. FACTS

Craft undertook the representation of Elsworth Coburn and Harold and Anne Hurst (collectively the "defendants"), after they were sued in April 1985, along with Larry Wampler and Wampler Brothers Coal Company ("Wampler Brothers"), in Letcher Circuit Court by Burtis Adams ("Adams"). Adams claimed one-half (1/2) ownership in the coal and royalties from coal properties the defendants had leased to Wampler Brothers. A copy of Adams' deed was attached to his complaint, which also disclosed his chain of title.

Wampler Brothers, through its counsel, Harold Bolling, then filed a cross-claim against the defendants for royalties it had previously paid, or was to pay, to the

defendants.[1] Those who have handled mineral litigation in the "unsurveyed" wooded hills and valleys of eastern Kentucky understand the tediousness, expense and difficulties connected with mineral title litigation in this region.

Craft was retained by Elsworth Coburn (Coburn), who lived in nearby Garret, Kentucky. Coburn requested the representation upon behalf of himself and his former sister-in-law, Anne Hurst (Mrs. Hurst), and her husband, Harold—Coburn's co-tenants in the property, as the Hursts lived some distance away in Lexington and Mr. Hurst had been hurt in an accident. The Hursts *never* met with Craft.

Craft, however, had been suggested to Coburn by Mrs. Hurst, who had taught Craft in grade school. As is often the case with distant clients, Coburn, living near Whitesburg, was to be the contact person and "go-between" between Craft and the Hursts. The handling of the case, as well as the communications and actions between Craft and the defendants prior to the onset of Mrs. Hurst's illnesses in late 1999 or 2000, documents this practice.

Providently, or improvidently, for the defendants, the plaintiff, Adams, literally disappeared sometime prior to March 31, 1988. His counsel, Daniel Dotson, *then without a party to contact*, withdrew on that date and an order was entered *giving Adams thirty (30) days to retain new counsel*. It is acknowledged Adams was *never served* with this order. Yet, two years later, on September 6, 1990, the Letcher Circuit Court dismissed Adams' complaint for want of prosecution per CR 77.02(2).[2] Likewise, Adams was *never served* with this order.

---

1. According to discovery, the defendants were paid $59,073.66 in 1984. There is no evidence disclosing later amounts paid, other than the $11,000 put in escrow with Craft in 1986.

2. CR 77.02(2) dismissals are *without prejudice* and one would assume the applicable statute of limitations would be fifteen (15) years, since the action would involve real estate and minerals, and, in the event Adams did own an

On September 10, 1990, Craft wrote Coburn, referencing their recent conversation and attaching the CR 77.02(2) dismissal order, and explained:

> [T]his is merely a "housekeeping" order and does not mean that your case is permanently dismissed but can be reinstated when we find Burtis Adams and can insure that he has gotten a copy of the order directing him to hire an attorney to represent him in this matter. As you can see from the notations on the enclosed [order], even the circuit clerk does not have an address for Mr. Adams *and cannot mail him a copy of the order.*
>
> Again it was a pleasure seeing you and I will try [to] locate Mr. Adams so that we can get this case concluded at the earliest possible time. *Please say hello to the Hurst family and explain to them what is going on.*

(Emphasis added).

The dismissal was further complicated by a prior "agreed order" of the court dated September 18, 1985, directing "that all mineral royalties derived from the property ... should be ... deposited in an escrow account and held there pending further orders of this Court."[3] In compliance with this, but in order to secure a higher rate of interest than the passbook savings rate used by the clerk, counsel agreed that Craft would hold the money as escrow agent until the matter was resolved. Thus, on April 24, 1986, Craft purchased C.D. # 8517 at First Security

Bank with $11,032.41 provided to him by the defendants.[4] Interest was added back by C.D. # 10398. Both were later consolidated into C.D. # 6021104725.

In order to transfer their checks to the escrow account, the Hursts executed a handwritten Power of Attorney on September 14, 1985, notarized by their daughter, Marilyn Hurst (then Warren), authorizing Coburn "to sign legal instruments for us relating to making a deposit of a check in an escrow account for us." The escrow C.D.s were then titled "James W. Craft, Trustee for Civil Action Number 85–CI–149," but were maintained under Coburn's social security number.

The Honorable Byrd Hogg was the Circuit Judge at the time of the·dismissal. According to Craft, he called the escrow account problem to Judge Hogg's attention at the CR 77.02(2) hearing, whereupon the judge said, "[w]ell, continue to hold the funds and if anybody wants the money, they can file a motion to re-docket." Judge Hogg died several years later. And there the matter rested, best summed up by Coburn's statement, made to his wife *just after he'd met with Craft following the entry of the order of dismissal,* that "the money is in escrow and we just let it lay[.]" Meanwhile, Craft, with Dotson's help, continued for years to try to locate Mr. Adams. In 1995 or 1996, Craft even went over to the community of Mayking to try to find him. Even the attorneys who finally resolved the matter in 2005 told the

---

undivided interest as specifically pled in his complaint, it would not have run until fifteen (15) years from "sufficient notice" of his "disseizen." *Moore v. Gaines,* 308 Ky. 223, 213 S.W.2d 990 (1948).

**3.** This practice serves the interest of all the parties including the mining company, as it allows (1) mining to continue for the ultimate owner's benefit during the litigation and (2)

without the mining company risking payment of additional royalties to the wrong party.

**4.** The amount deposited indicates the order may have been interpreted to apply only to the royalties paid after the suit was filed as interrogatory answers indicate the defendant's were paid $59,073.66 in 1984. Suit was filed April 1985.

court *then* that they had also tried to locate Adams, but couldn't find him.

Yet, in 1991, the relationship between Craft and the defendants changed. At a meeting with Coburn on how they could get the money released, Craft expressed difficulty in having the time to continue to devote to the case. According to Craft, he had just finished three major death penalty cases, his mother had been ill and died, and he was going through a divorce. He told Coburn, "why don't you hire somebody else to do that for you. I'll continue to hold the money and then when I get some direction, I'll surrender it." *Neither Coburn nor the Hursts ever personally sought his help again in getting the money released.* However, Coburn would still stop by often to check on the amounts in escrow. Other than the necessary tax withholdings for interest earned, *no money was ever taken out of the account. In fact, Craft never charged the defendants for any of his legal services or actions as escrow agent.*

According to Coburn's widow, Coburn told her after this 1991 meeting, "I talked to James Wiley today and *we're going to have to get someone else* because he can't practice and I have gone to Will Collins's office. [T]ake this checkbook and write in the check ledger I have employed [attorney Will Collins] with a three hundred and fifty dollar *retainer* [5] for him to check into this and see what he can learn or find out or whatever." [6] A copy of this $350 "re-tainer" check was produced and filed of record. According to Craft, his representation of the defendants (as clients) ceased at this time. Moreover, Coburn's widow agreed with Craft's characterization of the relationship as having been terminated. Thereafter, he was just the escrow agent.

Whatever Will Collins (Collins) did on the matter remains unknown as he did not testify at the evidentiary hearing. [7] Yet it is certainly relevant as to *who* should have done what—and *when*. That he *did appear* at least once in the case is suggested by Adams' former counsel, Daniel Dotson. And, the court hearing video of May 25, 2005, discloses an appearance by Collins, where he states that *he doesn't recall* whether "he did or did not appear in [the] case," as "the file [he] had on the matter was destroyed in 2001, if [he] had one."

Yet, the real complainant, Mrs. Hurst's daughter, Marilyn Hurst, was certainly speaking with Collins and even sent him a copy of the court file in 2001, preparatory to a September 2001 letter she wrote to Craft. She agreed, however, with the characterization of Collins' dealings with her as an attorney/client relationship. But enough of this for now.

Craft resigned from the practice of law in June 1998 due to a felony criminal plea in the United States District Court for Eastern Kentucky. He then notified all of his active clients of his resignation and future inability to represent them. He did

---

5. "Retainer" is defined as: 1. A client's authorization for a lawyer to act in a case. 2. A fee that a client pays to a lawyer simply to be available when the client needs legal help during a specified period or on a specified matter. 3. A lump-sum fee paid by the client to engage a lawyer at the outset of a matter.— Also termed *engagement fee*. 4. An advance payment of fees for work that the lawyer will perform in the future.—Also termed *retaining fee*. *Black's Law Dictionary*, 1341–42 (8th ed.2004).

6. Elsworth Coburn died in May, 2002. Harold Hurst died in 1986. Anne Hurst became quite ill, suffering Alzheimer's disease and heart problems by late 1999 or 2000. She died in a nursing home in 2004.

7. Questions asked of Marilyn Hurst in her deposition suggest Collins, when contacted, may have asserted attorney/client privilege, at least to his dealings with Marilyn Hurst.

not send a letter to Coburn or the Hursts because "what I had previously told Mr. Coburn, I ... didn't consider them really at that point to be clients." However, even after Craft's resignation in 1998, Coburn kept in touch with Craft to check on the escrow amounts. He was aware of Craft's resignation from practice.

Then, beginning around the spring of 2001, Mrs. Hurst's daughter, Marilyn Hurst (Marilyn), entered the picture. She held a deferred general power of attorney for her mother, Anne Hurst, to be effective

> on the date I become disabled, incompetent, or incapacitated and unable to manage my affairs, in the sole discretion of my said attorney-in-fact and such rights, powers and authorities shall remain in full force and effect thereafter until revoked, by operation of law, at my death.

(Emphasis added). As the Trial Commissioner's findings are essentially based upon Marilyn's testimony, it is important to establish her relationship to the events and parties involved. Excerpts from her testimony do this best:

Q. In 1985 when these events were occurring, were you aware that they were happening?

A. Yes.

Q. And how were you aware?

A. Well, at that point, I was living in Lexington; and my parents, you know, kept me posted on some of the— you know, they were upset over the fact that the mineral rights had been questioned and that kind of thing. So, I was aware that they had James Wiley as their attorney.

Q. At that point, were you handling the affairs for either one of your parents; or were they able to take care of matters on their own at that point?

A. No, they were able to take care of everything on their own.

Q. At some point, did you begin to handle matters for one or both of your parents?

A. Yes. My father passed away in 1986, and he was totally cognizant up until the hour of his death. My mother on the other hand became quite ill, and I handled all of her matters from about 2000— probably around 2000, 2001 until her death last September.

Q. So, that would be September of 2004?

A. Yes.

 * * * * * *

Q. When, if ever, did you have conversations with your mother about these events? I mean at what point did your mother, if you know, at what point did she tell you that she was aware that these things had happened, that the case had been dismissed, or—

A. Oh, she was never aware until I found out.

Q. *Okay. So, what statements did she make to you prior to her disability or her death that led you to believe that she was not aware?*

A. Well, she asked me several times to try to find out what had happened to that escrow account. And she said, you know, it's been so long. This was 1985. And, you know, here we were dealing with, you know, 2000. She had had no communication at all that— she didn't know where the money was. She didn't even know if there was any money left. So, that s— she began talking to me. As I had said, she lived with me for a year-and-a-half also.

Q. When was that approximately that she lived with you?

A. Let's see. I guess she came to live with me in late 1999, 2000, and lived

with me about a year-and-a-half. Then, she went into a nursing facility.

Q. What was her condition during the period of time that she lived with you?

A. She was still able to function quite readily. She had had open-heart surgery, and I think probably that— you know, she never really recovered very well from that. And she also had—she later developed Alzheimer's.

Q. So, would she have periods where she was more cognizant than others during the time she lived with you, or was she mentally pretty much stable when she was with you?

A. My mother the whole time she lived with me was quite cognizant. Her problem, and one reason that we didn't want her to live by herself, was due to the fact that she fell quite a bit. She developed some problems with anxiety, I guess as a result of her openheart surgery.

She also was incontinent. And she was not— she didn't feel comfortable writing checks and that kind of thing. So, I took over all of that.

Q. When she was living with you. You've brought me, and I really appreciate it, this power of attorney.

A. Uh-huh (affirmative).

(Attorney comment deleted.)

Q. And it, of course, states—it was signed back in September of 1991.

A. Uh-huh (affirmative).

Q. And it states that it, you know, will come into effect upon disability. So, I wanted to find out from you when you started using the power of attorney.

A. You know, Dana, I probably— I'm not sure. I really don t know. I began writing checks for her, and I really can't give you a date. I just don't know.

Q. When she lived with you, were you using it?

A. Yes.

Q. So, either then or before then, that time period, is when you began using— you were using it at least during that time period?

A. Yes.

Q. And up until— up and to her death— up until the time she died?

A. Yes.

(Emphasis added).

In the spring of 2001, Marilyn called Craft to inquire about the escrow. He told her then that it was "a little over $19,-000." [8] When she inquired what needed to be done in order to close it out, he told her she needed to hire an attorney and noted that his "son Jimmy is an attorney here in Whitesburg. If you'd like, we can turn it over to him; I can get the papers to him." Marilyn, however, did not contact Craft's son. Craft maintained that he was concerned with his *potential liability for wrongful distribution as escrow agent* under the doctrine of *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 32 L.Ed.2d 556. L.Ed.2d 556 (1972) ("For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they first must be notified.").

On July 3, 2001, Marilyn (a.k.a. Jo Warren) wrote a letter to Will Collins, with whom she had at least spoken to on the phone earlier in the year:

Dear Will,

Here's the file from the Circuit Court's office. I found them to be quite interesting!

Where do we go from here? After you've had a chance to look at the mate-

---

8. On April 12, 2001, it was $19,882.12.

rial, call me and let me know whether I still need to make a phone call to James Wiley. This might be sufficient since the amounts are listed.

Thanks for your help,

Jo Warren.

Then, on September 30, 2001, she wrote Craft, stating:

I understand that this lawsuit was dismissed in 1990 so there would be no reason for me to hire a lawyer at this point. *This should be a simple matter for you to close out the account and send checks to both my mother and Elsworth for the full amount they are owed.* This is been a long and arduous wait for them and they deserve to have this settled without any more hassle and delay.

(Emphasis added).

In her deposition, Marilyn said that she felt at the time, not knowing the law, it was just a "simple matter." Her explanation for why she did not retain an attorney between 2001 and 2005 was that she had called several people in surrounding counties, but nobody would take the case. She indicated that Will Collins didn't want to take it because of "ongoing ill feelings between him and Mr. Craft and vice versa," and she indicated that she did not want to hire someone from Lexington because of the extra billing on travel, thinking that it "would be a waste of money." As to why she didn't hire Craft's son in Whitesburg, she just "elected not to."

As to Mr. Collins, she testified:

A. I never hired Mr. Collins. I talked to him several times on the phone, but never obtained counsel from him. I never hired him, never paid him one penny.

Q. You did seek legal advice from him, though, did you not?

A. I did have several telephone conversations with him.

Marilyn's relationship with Collins raises some interesting questions, which were brought to light during her deposition:

Q. When you spoke with Mr. Collins in 2001 regarding the escrowed funds, did he have any— did he advise you about the legal status of escrowed funds, being held for a third party, how claims were to be made to those funds, things of that nature?

A. No. He did indicate to me that, after my conversation with James Wiley and the— his name was on the CD, Mr. Collins indicated to me that there is a law against commingling of funds.

And, of course, at that time, I wasn't— I was not privy to a lot of information. So, I didn't know whether there had been commingled funds or not. But he did mention that to me.

Q. And, in fact, ma'am, based on all the review that you've made of the documentation up to the present time, there never was any commingling of any funds?

A. No.

Q. You're agreeing with me? There was no commingling?

A. Yeah. But I didn't know that at the time.

Q. That was your belief at the time based on information that, what, that Mr. Collins had provided to you, Will Collins?

A. Well, my conversation with James Wiley when he said that it was under his name and Social Security number.

Q. Did he say it was under his Social Security number?

A. Yes. On the telephone, he said it was under his name and Social Security number.

Q. And you've since learned that, in fact, it's under the Social Security number of Mr. Coburn?

A. Yes.

Q. So, with all due respect, ma'am, could you have been mistaken as to what Mr. Craft indicated to you on the phone as to the Social Security number of that account?

A. No. He said it's under my name and Social Security number. That's what I heard.

Q. When you made contact with Mr. Craft in 2001, did you want him to pay the money over to court for distribution; or did you want him to give you half of the money for your mother, Anne Hurst?

A. Not being aware of the law, Mr. Ostermiller, I did think it would be a very simple matter. I thought Mr. Adams can't be reached. He's obviously either deceased or he's moved away somewhere. Nobody had a forwarding address for him.

Q. Let's back up for a second, ma am. Your letter of September 2001,——

A. Yes.

Q. was sent months and months after you had already had, according to your own testimony, numerous conversations with Will Collins.

A. Right.

Q. So, when this letter was sent in September of 2001, you'd had numerous opportunities and, in fact, exercised those opportunities to confer with Mr. Will Collins, an attorney, as to what your legal rights and responsibilities were, correct?

A. Well, I was trying to get him to take the case. And, so, I did send some files to him.

Q. You sent him the file in July—— in early July of 2001, and you talked to him about the case——

A. Right.

Q. after July 2001, before you sent the letter.

A. Uh-huh (affirmative).

Q. And he indicated to you that he wasn't—— he didn't want to represent you because of some ill feelings that he had towards Mr. Craft and that——

A. And vice versa.

Q. But having said that, he was willing to confer with you behind the scenes as to what your legal rights and—what your legal rights were as to pursuing the money?

A. I don't ever remember Mr. Collins saying anything about—— *he suggested several times that I get an attorney and, you know, have the attorney take over the case.* And I did call him a couple of times after I would try to get an attorney. And I said I can't get anybody to take it. He gave me a couple of names. They didn't pan out.

So,—— but that's the extent. *He never told me about going to court and [getting] a warning order attorney.* He didn't tell me any of that.[9]

(Emphasis added).

Marilyn ultimately testified (based upon alleged statements from her mother) that her uncle, Coburn, *never told her mother,* Anne Hurst, that (1) the case was dismissed in 1990, (2) that Craft had withdrawn as their attorney in 1991, and (3) that Craft had resigned from his practice in 1998. This notwithstanding, *the memo*

---

9. Mr. Collins spoke with the investigator for the Character and Fitness Committee in 2003 concerning Craft's pending petition for readmission and brought this matter to their attention.

*from her 2003 interview* with the Character and Fitness Committee investigator; Mr. Bill Cravens, reflects:

Mr. Hurst and Coburn have since died. Mrs. Hurst is in a nursing home suffering from Alzheimer's.

Mrs. [Marilyn] Hurst recalls conversations she had with her Uncle (after her father died) about the money. The Uncle [Coburn] would say that he visited with Craft, and Craft would place a call to a bank and verify the money and the amount. The Uncle continued to trust Craft and told Mrs. Warren [Hurst] not to worry about the money.

In this same regard, Coburn's widow, Levita, testified that "anything that came up about [the case], [Coburn] was on the telephone and talked to them." As to notice of the case's dismissal, she testified:

Q. Now it says, the second sentence [of Craft's letter] says "please say hello to the Hurst family for me and explain to them what is going on." First off, is that reference in there to Mr. Coburn advising the Hursts what was going on, is that consistent with the way it had always been—

A. Yes, sir.

Q. —in the lawsuit with Mr. Coburn providing information to the Hursts?

A. Yes.

Q. What, if anything, do you recall about Mr. Coburn communicating any information to the Hursts regarding that September 1990 letter? [referencing the CR 77.02 dismissal]

A. He gave them a call on the phone.

Q. Were you present when he made the call?

A. I was in the house. I didn't set [sic] there and listen, no.

Q. Was it a situation where Mr. Coburn gets a letter and then says something like "I've got to make a call"?

A. He said "I'll have to let Neen know." He always called her Neen.

Q. Neen?

A. Neen was a nickname for Anne Hurst.

Finally, in May of 2005, Marilyn hired counsel and entered her appearance on behalf of the Estate of Anne Hurst, as did Levita Coburn for the Estate of Elsworth Coburn. A hearing was held on various motions on May 22, 2005. Mr. Craft appeared at the hearing, and offered to do anything the court wanted with the escrow. Within a month (June 23, 2005), the court directed "the escrow agent, James W. Craft," to deliver the certificates of deposit to the clerk of the court.[10] On October 31, 2005, after several more hearings and the receipt of the warning order attorney's report, the court ordered the monies to be distributed—one-half to Marilyn and the other half to Levita Coburn. A full accounting of the funds was given to the Court and the Trial Commissioner by Craft. No complaints were ever made that any of the monies had ever been missing.

## II. THE COMMISSIONER'S PROCEEDINGS

Marilyn Hurst's testimony was taken by deposition on June 28, 2005. Craft, Adams' former attorney, Daniel Dotson, and Coburn's widow, Levita Coburn, testified live at the hearing on June 29, 2005. On January 25, 2006, the Trial Commissioner entered his amended report, wherein he made the following findings:

---

**10.** At the court hearing on June 22, 2005, counsel for the parties advised the court that they wanted to keep the escrow in the C.D.s as they earned more interest than the clerk's passbook savings rate.

VI. Levita Coburn, the Widow of Elsworth Coburn, testified that her husband acted as a go-between for the Hursts and Mr. Craft as Counsel in the Letcher suit. This was supported by a copy of a 1990 letter entered as Respondent's exhibit No. 2 which instructed Mr. Coburn to tell the Hursts about the dismissal of the suit. Marilyn Jo Hurst, Anne Hurst's Power of Attorney, testified from 1999 on there was no information on the lawsuit given to her mother by Mr. Coburn. There was no evidence of direct contact between Mr. Craft and the Hursts.

VII. The Coburns felt that Mr. Craft no longer represented them as of May 1991, but Marilyn Jo Hurst denied knowledge of such change in representation. Nothing of a formal nature was filed in the Letcher Circuit Court regarding a change in representation. The respondent has mentioned that the Letcher Circuit Court recited that Adam Collins was substituted for Will Collins as former counsel in the action by its June 27, 2005 Order. Despite such, the docket of the action makes no notation that Will Collins was ever formally recognized as Counsel of record for the Defendants.[11]

VIII. The funds placed in escrow were properly accounted for and there is no allegation of misappropriation of the funds.

IX. The Respondent's license to practice law was suspended as of January 9, 1998, and in June of 1998 he resigned from the practice of law under terms of disbarment.

X. In 2001 Marilyn Hurst initiated contact with the Respondent to resolve the escrow issue. She was told to retain other counsel and finally did retain other counsel in May of 2005.

XI. From the dismissal of the Letcher suit in 1990 until 2005 there were no formal efforts by Mr. Craft to obtain a disposition for the escrowed royalties.

## III. COMMISSIONER'S CONCLUSIONS

From the foregoing, the Trial Commissioner concluded that the *"lack of due diligence"* charge (Count I: SCR 3.130–1.3) *in failing to resolve the escrow matter,* was proven by a preponderance of the evidence. "Nothing substantively was done to resolve the royalty issue between [1990] and June 1998 when the respondent resigned from [the] practice of law. Further, after his resignation, he did nothing substantively to resolve the escrow issue."

The Trial Commissioner also concluded that *Craft failed to notify his clients of his withdrawal from the practice of law* (Count II: SCR 3.130–1.4(a)). "His contention that he was not actively representing Mr. Coburn and the Hursts is not accurate, *as he was not relieved of his escrow duties and was holding a substantial amount of money in which they had an interest."* (Emphasis added).

---

11. The court order as well as the motion *does reflect* the substitution for Will Collins. The May 19, 2005 "Notice of Entry of Appearance/Substitution of Counsel" filed by Adam Collins for Levita Coburn, as administratrix of the estate of Elsworth Coburn, and the June 27, 2005, order substituting counsel reflects such. Moreover, Will Collins appeared at the court hearing on these motions on May 25, 2005, noting that he did not recall "if [he] did or did not appear" in the case, but "the file on this matter was destroyed in 2001, if [he] had any." He had, however, no objections to the motions. At the subsequent hearing on June 22, 2005, Mr. Adam Collins reiterated that his client, Levita Coburn, maintained that Will Collins had been retained by them and brought to the court's attention the $350 retainer check paid to Collins on May 1, 1991.

*He also found Craft guilty of failure to expedite litigation (Count III SCR 3.130–3.2).* "It appears that the title situation and the plaintiff's disappearance are perplexing and complicated problems. However, Mr. Craft's duty could have been met by placing the escrow matter before the Letcher Circuit Court to obtain a final resolution."[12] The commissioner also found *Craft guilty of failing to render an accounting (Count IV SCR 3.130–1.15(b)).* "Mr. Craft technically failed to render formal accountings on the funds."

On April 3, 2006, the KBA Board of Governors adopted the commissioner's findings and recommendations on a joint appeal by the parties by an 18–0 vote. We elected to review pursuant to SCR 3.370(9).

### A. STANDARD OF REVIEW

"As to disciplinary matters, recommendations of the Bar Association Board of Governors are advisory in nature, and this court makes [an] independent review of the record and findings of fact." *Grigsby v. Kentucky Bar Ass'n,* 181 S.W.3d 40, 42 (Ky.2005). "The action of the board of governors of the bar association [in attorney disciplinary proceedings] is essentially a screening process. A final decision of guilt can only be made by [the

Supreme Court], and it is done on the basis of a *de novo* consideration of the pleadings and the trial record." *Kentucky Bar Ass'n v. Franklin,* 534 S.W.2d 459, 463 (Ky.1976) (citation omitted).

### B. REGULATION OF ACTIVITIES OUTSIDE THE PRACTICE OF LAW

The purpose of the Kentucky Bar Association is "to maintain a proper discipline of the *members of the bar* [.]" SCR 3.025 (emphasis added). In addition, the KBA has authority to initiate proceedings concerning the unauthorized practice of law, SCR 3.460(1), as well as violations of disbarment or suspension orders. *See Wright v. Kentucky Bar Ass'n,* 169 S.W.3d 858 (Ky.2005) (during period of suspension, Wright filed a pleading upon behalf of a client and failed to disclose to Court that she was suspended); *Kentucky Bar Ass'n v. Klapheke,* 122 S.W.3d 64 (Ky.2003) (finding that Klapheke failed to follow the Court's order to notify his clients of his suspension). Yet, "[w]hatever duties the code of professional conduct may impose upon licensed attorneys, it has no relevance to the conduct of lay persons," *Gailor v. Alsabi,* 990 S.W.2d 597, 605 (Ky. 1998), or non-members, unless they at-

---

**12.** This suggestion implies that *there were no risks* to Coburn and the Hursts by Craft's pushing for a complete resolution of the matter early on, ignoring the possibility that *Adams' title was valid* and that the Wampler Brothers had a cross-claim pending against them for royalties previously paid in at least the additional amount of $59,073 for 1984. As it turned out, *the defendants' rights to the royalties were resolved without resolution of the title question,* the statute of limitations *expired* on the claim, and the money was distributed at a higher rate of interest than the clerk's regular passbook rate, *without any charges or billing from Craft.* Coburn did, however, pay Will Collins ($350), and Marilyn Hurst paid Donald Smith $1000 in attorney

fees to get the money disbursed. Although Bar Counsel recommended that Craft repay the $1000 in attorney fees paid to Donald Smith, the Commissioner recommended otherwise, as "such would have had to be incurred irrespective...." Certainly, there is always the question of whether you should ever kick a sleeping dog, and *there is no evidence that Wampler Brothers would have agreed to a disbursement, absent the expiration of the statute of limitations,* as the escrow amount provided at least partial security for any liability they may have had for wrongful payment of royalties—that is, until their potential liability expired with the statute of limitations.

tempt to practice law in Kentucky, *Kentucky Bar Ass'n v. Shane*, 553 S.W.2d 467 (Ky.1977), or fail to comply with disbarment or suspension orders. *Klapheke, supra.*

◼◼ In Kentucky, there is no requirement that escrow agents be licensed attorneys. Simply put, there are no recognized or mandatory connections between the activities of an escrow agent and the practice of law. *See* SCR 3.130—1.15, Comment 4. On the other hand, a licensed attorney undertaking to act as an escrow agent remains subject to the Kentucky Rules of Professional Conduct. That is because of his status as a licensed attorney, not his assumption or performance of the duties of an escrow agent. Here, the record discloses that the Trial Commissioner and the Board of Governors, in arriving at their Findings and Conclusions, considered Mr. Craft's conduct from 1990 through 2005, *even though Mr. Craft was not a member of the KBA, nor acted as counsel, from the period of his resignation in June 1998 through the hearing on June 29, 2005,* nor is there any assertion he was in violation of any orders involved in his resignation.

◼ It was thus improper to apply the Kentucky Rules of Professional Conduct to Craft during the time period (post-June 1998) when he was neither licensed, violating orders of resignation, or practicing law without a license.[13] Continuing to act as an escrow agent for multiple parties after proper cessation of practice is not a matter regulated by the rules. "This rule, we think, will not unduly circumscribe the disciplinary function of the Bar Association." *In Re Wehrman*, 327 S.W.2d 743, 744 (Ky.1959).

Even the cases cited by the KBA in their brief[14] support this position, as all deal only with post-disbarment or suspension violations involving (1) unauthorized continuation of practice, and/or (2) failure to notify the courts or clients of the loss of the privilege to practice. *Templeton v. Kentucky Bar Ass'n*, 54 S.W.3d 154 (Ky.

---

13. This is not to suggest that conduct outside the practice of law is not relevant upon applications for admission or readmission. *See* SCR 2.011.

14. *Wright v. Kentucky Bar Ass'n*, 169 S.W.3d 858 (Ky.2005) (finding attorney guilty of practicing law while suspended (unauthorized practice of law) and of a lack of candor toward the tribunal); *Kentucky Bar Ass'n v. Roberts–Gibson*, 122 S.W.3d 69 (Ky.2003) (finding attorney guilty of unauthorized practice of law, failure to respond to charges by the Inquiry Commission, and a failure to notify clients and return files following her previous suspension); *Kentucky Bar Ass'n v. Klapheke*, 122 S.W.3d 64 (Ky.2003) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law) and failure to notify current clients of his suspension and subsequent resignation); *Kentucky Bar Ass'n v. Roberts*, 114 S.W.3d 843 (Ky.2003) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law), knowingly lying to a client concerning a settlement, and fail- ure to keep the client reasonably informed); *Kentucky Bar Ass'n v. Roberts–Gibson*, 97 S.W.3d 450 (Ky.2003) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law) failure to respond to a disciplinary complaint, and misrepresenting her status as an attorney to the court and her clients); *Kentucky Bar Ass'n v. Zimmerman*, 69 S.W.3d 465 (Ky.2001) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law) and lying to clients about their cases); *Allen v. Kentucky Bar Ass'n*, 985 S.W.2d 347 (Ky.1999) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law)); *Kentucky Bar Ass'n v. Smith*, 913 S.W.2d 317 (Ky. 1996) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law) and failing to notify current clients of his suspension); *Kentucky Bar Ass'n v. Marshall*, 613 S.W.2d 129 (Ky. 1981) (finding attorney guilty of continuing to practice law while suspended (unauthorized practice of law)).

2001), for example, involved SCR 3.130–3.3(a)(1) (candor towards a tribunal) when the movant knowingly filed an incorrect itemized invoice with this Court in support of his petition to dissolve an order of temporary suspension. Quite different from the facts here.

We do not hold that a failure to notify a client of the loss of the privilege to practice is not actionable, as it surely is. Yet in this case, we do not believe the record supports any finding or conclusion other than that Craft withdrew from the representation of the defendants in 1991. This belief is overwhelmingly supported by the testimony of Coburn's widow, Levita Coburn, and the $350 "retainer" check paid to Will Collins in 1991 after Coburn's conversation on their behalf with Craft. Moreover, all of this is supported by the fact that there is no evidence in this record that at any time after these events in 1991, Anne Hurst, while in good health, (1) contacted or retained any other counsel for herself, (2) complained to, or inquired of, Craft (whom she had taught and known), or (3) complained to any other official or entity concerning the matter.

As SCR 3.130—1.4(a) deals only with "clients for whom [the attorney] is actively involved in litigation and similar legal matters," see SCR 3.390 and *Kentucky Bar Ass'n v. Perry,* 102 S.W.3d 507 (Ky.2003), no such obligation or notification requirement existed here.[15] Continuing to hold money simply as an escrow agent for multiple parties after the cessation of practice does not establish or continue the parties in interest as one's active clients. To hold

otherwise would inconsistently establish Adams as Craft's client also.

## C. *ROYALTY ISSUES (1990–JUNE 1998)*

■ We now address the Commissioner's conclusion that "[n]othing substantively was done to resolve the royalty issue between [1990] and June 1998 when the respondent resigned from [the] practice of law."[16] The fallacy with this conclusion is that it *assumes* that by compelling the resolution of the royalty issue involved, *the defendants would have been successful,* and therefore, they would have received their escrow amounts earlier. Such an assumption easily ignores any interplay the expiration of the statute of limitations may have had in the resolution of this matter. Of course, *it is easy to make such a call now*—without any "real world" risks to expectant or hopeful clients.

For example, Adams' complaint filed April 30, 1985, alleged in part:

12. That the plaintiff derived title to the property in question by virtue of a deed ... from *Delorce Hall to Burtis G. Adams* ... a copy of which is attached hereto and labeled plaintiffs exhibit III.

. . . .

14. That the defendants derived title to the property in question herein in part by virtue of a deed of conveyance from Jeff Wysor to Bruce Wampler *and Delorce C. Hall,* dated September 10, 1937. . . .

15. That the deed previously referred to above ... created tenants in common.

---

15. Coburn's widow's version of the events supported Craft's version, and she was as much entitled to the money as Marilyn, Anne Hurst's daughter.

16. In its brief, the KBA attempts to argue Craft's actions between 1985 and 1990 in failing to answer interrogatories, etc., are evi-

dence of Craft's lack of diligence. However, conduct between 1985 and 1990 was never considered by the Trial Commissioner or the Board of Governors in their findings and recommendation that the Court find Craft guilty of violating SCR 3.130–1.3. Thus, this court will not consider it.

16. That the plaintiff and the defendants *are tenants in common* with plaintiff owning an undivided one-half interest. . . .

(Emphasis added).

The initial escrow deposit was $11,000, yet the amount paid to the defendants for the previous year, 1984, was $59,073.66. This amount too was at risk, even ignoring the fact that following the filing of Adams' complaint, the defendant's lessee, Wampler Brothers, also filed a cross-claim against them for *the full amounts wrongfully paid.* Moreover, assuming that pushing for a quick resolution of the $11,000 royalty issue was the best legal approach at the time begs the question as to *why this "simple" matter* wasn't undertaken by Will Collins upon the payment of his retainer in 1991, or by anybody else in the subsequent years for that matter. As Marilyn Hurst testified to, why were so many other attorneys in the area afraid to take this case during those years? It is an answer we'll probably never know, as who really owned the coal and the disputed royalties *was never determined*—not in the original court case, nor in this disciplinary matter. Being a court of law without the facts before us, we are not entitled to speculate as to who did really own the coal and royalties involved in the underlying action.[17]

We only know that once later counsel was secured—following the expiration of the statute of limitations—the defendant's successors received disbursement of the full escrow amounts with interest and without having ever paid the respondent, Craft, for any attorney's fees or escrow handling charges.

"A lawyer should act with commitment and dedication to the interest of the client and with zeal and advocacy upon the client's behalf. However, a lawyer is not bound to press for every advantage that might be realized for a client. A lawyer has a professional discretion in determining the means by which a matter should be pursued." SCR 3.130—1.3, Comment 1. "In questions of means, the lawyer should assume responsibility for technical and legal tactical issues. . . ." SCR 3.130—1.2, Comment 1.

As to Craft,

[i]f an attorney is under a duty imposed by law, then the attorney is required to comply with the law. Where prior actions of the client or the circumstances of the representation place the attorney in the position of a surety, then the attorney's conduct must comply with the law of surety. If a dispute should arise between the client and the third party, concerning a properly asserted claim, then the attorney shall protect the funds and property *until the dispute is settled or until ordered to distribute the funds or property.*

Kentucky Bar Ass'n Ethics Comm., Formal Op. KBA E–383 (1995) (citing *Unigard Insurance Company v. Tremont*, 37 Conn.Supp. 596, 430 A.2d 30 (1981) (holding that attorney converted funds by disbursing to client in disregard of plaintiff's known claims)) (emphasis added).[18] "An attorney may not do anything which will injuriously affect a former client in any matter in which the attorney formally rep-

---

**17.** A review of the early court record amply demonstrates how zealous Adams' attorney, Daniel Dotson, was in the pursuit of his case—until Adams disappeared.

**18.** Had this been a matter of concern at the time, upon notice in any then pending disciplinary proceeding, this court could have taken over the escrow funds, required the accounting and made decisions appropriate at the time. SCR 3.165(2); SCR 3.395(2).

resented the client." 7 C.J.S. *Attorney and Client* § 48 (2006).

### D. *LACHES*

■ Aside from the implicit question raised about *who should have hired the attorneys* to finalize the matter and *when they should have been hired,* the record raises a real concern of "laches." "While staleness in a charge against an attorney may prevent its being considered, a court will not refuse to hear charges of unprofessional conduct... even if a long period of time has elapsed since the conduct at issue occurred, *unless prejudice is shown.*" 7A C.J.S. *Attorney & Client* § 64 (2006) (emphasis added). "[O]ne claiming [this] bar based on delay must ... show prejudice." *Plaza Condominium Ass'n, Inc. v. Wellington Corp.,* 920 S.W.2d 51, 54 (Ky.1996).

Here we have a circumstance, which lingered for fifteen (15) years (from 1990 to 2005), but was rectified within almost a month of the retention of counsel. Advice to acquire counsel was given by Craft to the defendants fourteen (14) years earlier (in 1991) when he stepped out of the case and again, to Marilyn, four (4) years ago in 2001. According to Marilyn, even Will Collins tried to get her to get another lawyer in 2001. And, not one of the parties that were involved personally in any of the critical events, time periods, and communications (other than Craft and Coburn's widow, Levita) were alive to testify at the hearing to the facts from which the Commissioner's findings, conclusions and recommendations were made. Harold Hurst died in 1986, Elsworth Coburn in 2002, and Anne Hurst in 2004. Anne Hurst, of course, suffered from Alzheimer's disease, as well as heart disease.

It is fair to assume from the record that Anne Hurst was incapacitated to such an extent as to empower her daughter, Marilyn, to use the deferred general power of attorney by late 1999 or 2000. Anyone that has dealt with a spouse, sibling or parent who has Alzheimer's knows what it does with memories. According to the United States National Institutes of Health, National Institute on Aging, Alzheimer's "is a slow disease, starting with mild memory problems and ending with severe brain damage." *See* http://www.nia.nih.gov/Alzheimers/Alzheimers Information/GeneralInfo/ (last visited November 29, 2006).

The record supports a finding that Will Collins took a "retainer" from Coburn in 1991, after Craft suggested *they* get another lawyer to handle the matter. And, since Coburn hired Craft for himself *and the Hursts* and was the only contact that appeared in a lawyer's office there, it is fair to assume that Coburn's retainer was for himself *and the Hursts*—they were Coburn's tenants in common. Supporting this, the record is devoid of any evidence that the Hursts tried to secure any other lawyer during this time period, and Marilyn *was* consulting with Will Collins in 2000 and 2001.

Ignoring for the moment Coburn's widow's testimony that *Coburn did keep Anne Hurst apprised of all the relevant events,* we are all left guessing as to what happened during this time period. Guessing, of course, is not an appropriate standard, but it surely highlights the prejudice suffered by the respondent, who was entitled to a "full opportunity ... to defend himself/herself by the introduction of evidence, and to cross-examine witnesses." SCR 3.300. But other than himself and Coburn's widow, he had no witnesses. They were dead, and Marilyn's testimony was at best "second hand," even discounting the effect of Alzheimer's on her mother. And, if one assumes that a Respondent's testimony denying the charges is sometimes fairly, or unfairly, discounted due to self-

interest, then the prejudice from the lapse of time, *e.g.,* not having your former clients available to testify, is obvious.

### E. *SUFFICIENCY OF THE EVIDENCE*

■ That having been said, "[t]he burden of proof shall rest upon the Association in a disciplinary proceeding, and the facts must be proven by a preponderance of the evidence." SCR 3.330. This concern applies to Count I (lack of Due Diligence) in so much as it is based upon the Trial Commissioner's conclusion that Craft's withdrawal from the case was not communicated to Anne Hurst, and Count II (failure to communicate) in so much as the Trial Commissioner implicitly concluded that Anne Hurst was still Craft's "active client" upon his withdrawal from the practice of law. In addition, it affects the conclusions made in Count III as to Craft's failure to expedite litigation, as well as Count IV, his alleged failure to render an accounting, to the extent that Coburn was satisfied with the balance of the accounts as he checked on them from time to time and to the extent that this relevant information was, or was not, communicated to Anne Hurst as Elsworth's widow, Levita, says it was.

Marilyn was the only witness to testify that her mother, Anne Hurst, *was not notified* of the relevant facts, although she had no personal knowledge of these events to which she testified. All of her information allegedly came from her mother. Yet, prior to late 1999 or 2000, Marilyn lived apart from her family. Only by late 1999 or 2000 did her mother come to live with her for about a year-and-a-half before she was put in a nursing home. Her mother had had open-heart-surgery then and never really recovered very well, and she also developed Alzheimer's. Importantly, when her mother began living with her,

Marilyn began using the "deferred general power of attorney" under the noted self-triggering "incapacity clause." Given the general standards of businesses and banks, one would assume that this "incapacity" must have been palpably verifiable at that time.

■ Craft, of course, disagreed with Marilyn's testimony. Levita Coburn, Elsworth Coburn's widow, supported Craft's testimony. Mrs. Coburn was as much entitled to the money in escrow as Marilyn. Moreover, the absence of any evidence that Anne Hurst tried to contact anyone else about the case during these later years (before incapacity), supports a conclusion that she was so informed of the events and reasons. Thus, based upon the evidence before the commissioner, any conclusion that she was not so informed of the dismissal of the suit or Craft's withdrawal from the case and later, the practice of law (were it otherwise relevant), as well as the status of the escrow amounts checked on by Coburn, is pure speculation and could not be said to meet the burden of proof imposed upon the KBA—the "facts must be proven by a preponderance of the evidence." SCR 3.330.

> [T]he plaintiff ... must introduce evidence which affords a reasonable basis for the conclusion .... A mere possibility ... is not enough and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced it becomes the duty of the court to direct a verdict for the defendant.

*Texaco, Inc. v. Standard,* 536 S.W.2d 136, 138 (Ky.1975); *see also Chesapeake & O. Ry. Co. v. Yates,* 239 S.W.2d 953, 955 (Ky.1951). We cannot say such was the case here.

■ Nor are we willing to restrict the communication required by SCR 3.130—1.4(a) to only written or direct com-

munications from the lawyer. The essence of the rule is that the "client [be kept] reasonably informed." SCR 3.130—1.4(a). This is the command. How it is done is within the discretion of the lawyer, *but at his risk.* An attorney has no less rights than any other party, and as such, his or her discipline must be based upon more than speculation.

## F. *THE HEARSAY NATURE OF MARILYN'S TESTIMONY*

██ KRE 602 states that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Nor is hearsay admissible, "except as provided by these rules and the rules of the Supreme Court of Kentucky." KRE 802. In this context, "hearsay is a statement ... offered in evidence to prove the truth of the matter asserted." KRE 801(c). The "state of mind" exception is inapplicable here, as Anne Hurst's state of mind was not in issue in this proceeding. *See* KRE 803(3). Where one's state of mind is not an issue, testimony of such is irrelevant and is not allowed into evidence under KRE 803(3). *Bray v. Commonwealth,* 68 S.W.3d 375, 381–82 (Ky.2002). *Moreover, the "state of mind" exception excludes "a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, or revocation, identification, or terms of a declarant's will."* KRE 803(3) (emphasis added).

Whether or not conclusions in a disciplinary hearing should ever be based upon evidence of such nature as we find in this record is very troubling. That aside, it highlights the obvious deficiency in this case, namely, that everybody that knew anything from personal presence or experience, other than Craft and Coburn's widow, were deceased or incapacitated by the time of the charges and later proceedings.

On the hearsay issue, we do note there was no objection to the hearsay nature of the testimony given in Marilyn's deposition. Of course, the rules of evidence and civil procedure apply to all disciplinary matters, *see* SCR 3.300, SCR 3.340, and a failure to object (even to hearsay) essentially renders the matter waived on appeal. KRE 103(a)(1). However, the fact that much, if not all, of the testimony on which the Trial Commissioner and Board of Governors based their recommendations is hearsay, originating from a person who had Alzheimer's, should be enough for this Court to pause and consider the sufficiency (aside from the reliability) of the evidence in this case. This is, of course, a permitted function as part of our *de novo* review. *See Franklin,* 534 S.W.2d at 463; *Berry,* 626 S.W.2d at 633. These same concerns also apply to the testimony of Coburn's widow, Levita, other than the testimony regarding the $350.00 "retainer" check paid to Will Collins, which was produced in evidence.

## G. *ACCOUNTING*

Count IV charged that "the respondent violated SCR 3.130—1.15(b) by failing to deliver the mineral royalties to his clients, and by failing to render a full accounting of the mineral royalties to his client, Anne Hurst, upon the request of her power of attorney." Of course, Marilyn's power of attorney was not effective until late 1999 or 2000. In this regard, SCR 3.130—1.15(b) provides, in part:

> Except as stated in this rule or otherwise permitted by law *or by agreement with the client,* a lawyer shall properly deliver to the client or third person any funds or any property that the client or third person is entitled to receive *and, upon request by the client* or third per-

son, shall properly render a full accounting regarding such property.

(Emphasis added).

Comment 3 to this rule notes:

Third parties, such as a client's creditors, may have just claims against funds or other property in a lawyer's custody. A lawyer may have a duty under applicable law to protect such third-party claims against wrongful interference by the client, and accordingly may refuse to surrender the property to the client.

Comment 4 to the rule notes:

The obligations of lawyers under this rule are independent of those arising from activity other than rendering legal services. *For example, a lawyer who serves as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction.*

(Emphasis added).

In Finding VIII, the Trial Commissioner found that "[t]he funds placed in escrow were properly accounted for and there is no allegation of misappropriation of the funds." The Trial Commissioner, in Conclusion IV, acknowledged:

"It is clear from the record that the substantive parties knew Mr. Craft had these funds. Levita Coburn testified to an arrangement whereby Elsworth Coburn would relay information from Mr. Craft to the Hursts. The fact that Marilyn Jo Hurst contacted Craft in 2001 indicates that she knew he was holding funds."

Yet, the Trial Commissioner found that "Mr. Craft technically failed to render formal accountings on the funds. Even though periodic formal accountings were not rendered, there is no allegation that any funds were misappropriated. Consequently the respondent is guilty of failing to render periodic accountings, but is not guilty of failing to notify his clients about receiving the escrowed funds."

 This conclusion, notwithstanding its divergence from the findings, is certainly disconcerting as SCR 3.130—1.15(b) does not establish a formal accounting procedure, but simply requires that, "upon request by the client . . . [he] shall promptly render a full accounting regarding the property."

Coburn was coming by periodically to check on the amounts on deposit. Each time Craft would call and get the amount from the bank and give it to Coburn. According to Coburn's widow, Coburn was keeping Mrs. Hurst informed. Then in 2001, Marilyn called and spoke with Craft and inquired about the amounts.

Q. Did you ask Mr. Craft, either on the telephone on the one occasion that you were able to talk to him or through written correspondence, for an accounting, you know, to know how much was in the C.D. now?

A. Yes, I asked him in that phone conversation to tell me how much was in there. And he said, well, the last time he had received a statement, it was about nineteen thousand— a little over nineteen thousand. But— I said, so probably it will be a little more now? And he said, yes, but he just wasn't sure.

This was a spring of 2001 phone call, and the account statement for April 12, 2001, discloses the account amount was $19,882.12. Obviously, neither party to this phone inquiry considered it a formal request for a "full or formal" accounting. All other communications were simply demands that Craft disburse the money now, in apparent conflict with Comment 3 to SCR 3.130—1.15(b), which imposes "a duty under applicable law to protect . . . third-party claims against wrongful interference

by the client[.]" Furthermore, all the contacts occurred at a time post-resignation and only for reasons of his status as escrow agent, a point in time and status beyond the scope of our rules.

Even KRS 386.715(2),(3) regarding a trustee's duty to inform and account to beneficiaries does not apply to escrow accounts. *See* KRS 386.800(1),(2). Yet it establishes standards for trusts that "*[u]pon reasonable request*, the trustee shall provide the beneficiary with . . . relevant information about the assets of the trust. . . . [And][*u]pon reasonable request* . . . a statement of the accounts of the trust annually and on termination of the trust. . . ." (Emphasis added).

Thus here, under Count IV, the Trial Commissioner found Craft "technically guilty" by failing to render formal accountings of the funds, even though in each instance of the record where there was a request for information as to the funds it appears to have been given informally as requested and formal final accountings were given to the court and later to the Trial Commissioner at the hearings. Moreover, the Trial Commissioner concluded that "consequently, the respondent is guilty of failing to render *periodic* accountings." Yet, the rule does not establish any timetable for periodic accounting, except "upon request." There is simply nothing in the record regarding the phone inquiry by Marilyn that could be said to put anyone on notice that she wanted the exact amount—to the penny—right then. Craft told her in the spring of 2000 the amount was "a little over $19,000.00." On April 12, 2001, it was actually $19,882.12. We simply find no violations under these facts.

### CONCLUSION

Although there are many troubling issues in this matter, the most troubling to the Court were the issues of the sufficiency of the evidence to support the findings and recommendations, along with the potential prejudice to the respondent, absent the testimony of his former clients, to which all of these matters pertained. In the final analysis, it was not the length of the delay, although substantial, which posed the potential prejudice, but the absence of the clients' testimonies concerning matters which only they personally experienced. For these reasons, this Court cannot accept the recommendations. Consequently, it is ordered that this action is hereby dismissed as to all charges.

LAMBERT, C.J.; GRAVES, NOBLE and SCOTT, JJ., concur.

WINTERSHEIMER, J., dissents by separate opinion, with MINTON, J., and McANULTY, J., joining that dissent.

ENTERED: December 21, 2006.
Chief Justice
/s/ Joseph E. Lambert

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent because the evidence presented at the hearing is sufficient to support the recommendation of the Trial Commissioner and the conclusion and recommendation of the Board of Governors. SCR 3.130–1.15 requires an attorney to give a full accounting to the parties for whom the attorney holds property. The six (6) months suspension as recommended by the Trial Commissioner and the Board of Governors should be affirmed.

McANULTY and MINTON, JJ., join this dissent.