KENTUCKY BAR ASSOCIATION,
Movant

v.

Nancy Oliver ROBERTS, Respondent.

No. 2012–SC–000266–KB.

Supreme Court of Kentucky.

March 20, 2014.

Reconsideration Denied June 19, 2014.

Opinion and Order by Special Justice
DENNIS REPENNING.

A litany of words and phrases may be used to describe the long journey of this disciplinary case and the factual backstory preceding it, but words like "swiftness," "celerity," "dispatch," or "alacrity" are not included in the lexicon. This disciplinary proceeding and the facts giving rise to it cover a sixteen-year period: a death; an indictment; a manslaughter trial; a conviction and sentencing; an unsuccessful criminal appeal; an order of post-conviction relief based on ineffective assistance of counsel; and two sets of disciplinary complaints against Respondent, who represented the accused in the criminal case and represented him and others in related matters.

We now rule on whether Respondent Nancy Oliver Roberts was guilty of misconduct based on the nine charges brought against her by the Kentucky Bar Association. The trial commissioner found Roberts guilty of all nine counts and recommended a one-year suspension. The KBA Board of Governors took de novo review of the matter and recommended that Roberts be found guilty of two ethical violations and be suspended for 30 days. Both Roberts and the KBA Office of Bar Counsel have asked this Court to review the case under SCR 3.370, with Respondent requesting that all alleged ethical violations be dismissed, and the KBA asking that the trial commissioner's disciplinary recommendation be adopted instead of the Board's recommendation.

It was the unnatural death of one man that set in motion the chain of events.

## I. Facts.

Earl Manning suffered a violent death on November 23, 1997. His will left a 160–acre farm to David Manning, also known as Alan David Manning ("Manning"), one of his adopted sons. The will also devised other real estate to another son and to a grandson. The will named Lawrence Williams, a family acquaintance, as the executor of the estate and a local bank as the alternative executor.

Manning became an immediate suspect in the murder. When questioned soon after the crime, Manning told law enforcement that his father had molested him in the past. Manning's claim of abuse struck a resonant chord with the Commonwealth's Attorney, whose office had unsuccessfully prosecuted Earl Manning on molestation charges earlier. The Commonwealth's Attorney then offered Manning a flat five-year sentence for a guilty plea. But Manning had not consulted with counsel at that point and did not take the offer.

A few months later, Manning hired Respondent as defense counsel. Respondent was a friend of his adoptive mother and had represented the aptly-named Russell Justice, a friend of Manning's. It would appear that a part of the discussion of Manning's representation would have included a discussion of the practical effect of accepting a guilty plea. Because of past felony convictions, Manning would likely serve "shelf time" from the past offenses that would be triggered by a new conviction. The record below is unclear as to

the amount of backup time Manning would have to serve, and equally unclear when, and to what extent, Manning and Respondent discussed this eventuality. That Manning would serve more time than a straight five-year sentence is without controversy.

Manning and Respondent entered into a number of separate attorney-client agreements covering different matters. The initial employment contract purported to cover Respondent's representation of Manning through his anticipated indictment by a grand jury. A written contract dated January 24, 1998 included, inter alia, a stated fee of $2,500. A handwritten addendum to the contract stated: "I agree that Nancy Oliver Roberts can be paid $2,500.00 from my funds in any cash, bank account or any sources in Lawrence Williams' possession."

The next day, Manning was indicted for murdering his adoptive father and being a persistent felony offender in the first degree. That same day, Manning signed a second agreement with Ms. Roberts with respect to his murder charge. This agreement had the same hourly rate as the first agreement but specified that payment would be "pursuant to a promissory note and mortgage" for $25,000. No language in the agreement stated it was contingent on any result.

While the record below isn't entirely clear, it appears that within a few days after these agreements were executed, Lawrence Williams declined to be appointed as the executor of the estate.

In February 1998, Manning signed a promissory note in furtherance of the second representation agreement. The note provided that it was secured by a mortgage executed that same day. No such mortgage was ever executed, however. The note also provided for monthly payments to be made, though the space for the amount of those payments was left blank. Manning was incarcerated at this time and was not advised to speak with another lawyer about the note.

On the same day that the note was executed, Ms. Roberts entered an appearance on Manning's behalf as an heir in the probate of his father's will. None of the employment agreements with Ms. Roberts, including those that were concluded later, addressed the issue of Respondent's representation in any probate matters.

In March 1998, Ms. Roberts entered into a third agreement with Manning. Manning's purported spouse, Lunell Manning,[1] was also a party to this agreement. The purpose of the agreement was for an "EPO hearing, testimony in David Manning's case."[2] The agreement had a handwritten provision that Manning and Lunell would "waive any conflict of interest that may exist between" them. Manning also signed a handwritten note at the end of the document stating "I agree to pay Nancy [the Respondent] from sale of timber as method of payment, after payment of the retainer." Though the KBA's brief notes testimony indicating that Ms. Roberts believed, at the time of the execution of all three agreements, that Manning owned some land around his mobile home, accord-

---

1. Though Lunell Manning shared Alan David Manning's last name and was purportedly married to him, it was later learned that the marriage was not legal because both she and he were legally married to other persons at the time of the nuptials.

2. While KBA established the existence of this agreement, and though it would appear that representing the alleged victim and the alleged wrongdoer in an EPO setting creates a serious conflict of interest, KBA never seriously argued that this matter violated SCR 3.130–1.7(b), the conflict of interest rule.

ing to the trial commissioner, Ms. Roberts later admitted that the timber mentioned in the agreement was on land that was part of the estate that Manning stood to inherit.

Soon after, the Earl Manning will was admitted to probate. In May, Ms. Roberts moved the probate court to appoint Manning's friend Russell Justice as the executor of the estate. Justice was a local farmer with a high school education and no particular experience in probate matters. In June, the probate court appointed Mr. Justice as executor of the estate.[3] In August, Mr. Justice signed an employment agreement with Ms. Roberts for legal representation of the estate. Manning's brother, Andrew Manning, also signed the agreement as a client. Andrew Manning was one of the heirs under the will.

In September, Ms. Roberts sent a $1,000 check drawn from the estate's checking account and signed by Mr. Justice to Dr. Stephen Chauncy for ballistics expert witness services. Mr. Justice stated that Ms. Roberts had suggested the need for an expert and the method of payment. According to Manning's testimony in the disciplinary proceeding, his brother Andy had agreed to pay the expert out of estate funds, though no waiver or permission was signed by him or the other named heir or the representative of the estate.

In October, a second $1,000 check drawn on the estate's account and signed by Mr. Justice was sent to Dr. Chauncy. The word "loan" was written on the memo line of this check.

That same month, the Commonwealth again offered a plea bargain of a five-year sentence in exchange for a guilty plea to second-degree manslaughter. During the

disciplinary proceedings, Ms. Roberts testified that she did not advise Manning to take the plea deal, nor did she advise him to consult another attorney about it. Still, Ms. Roberts further testified that she spoke with Manning a great deal about the plea deal and that Manning maintained his innocence. In November 2004, at a hearing on an RCr 11.42 motion claiming ineffective assistance of counsel because of Ms. Roberts's alleged conflict of interest, Manning claimed that Ms. Roberts advised him *not* to take the plea agreement. The Assistant Commonwealth's Attorney who had prosecuted the case testified that he believed Ms. Roberts "was not going to accept any plea offer."

As trial approached, Ms. Roberts handled pretrial matters. One such matter addressed the issue of spousal privilege. Respondent moved the court to declare that the spousal privilege did not extend to Lunell Manning, since Lunell was not legally married to Manning. In the disciplinary hearing, Respondent testified that she had been ready to aggressively cross-examine and impeach Lunell but that Manning asked her not to. Manning did not dispute this in his later testimony.

At trial, Manning was found guilty of first-degree manslaughter and being a PFO. He was sentenced to life in prison. Less than a week later, Manning sent Ms. Roberts a letter in which he said he held nothing against her, that he "really thought [they] could win," that he should have "coped [sic] out" (i.e., taken the plea bargain), but that he "didn't kill anyone."

In November 1998, Ms. Roberts entered into a fourth employment agreement with Manning. This agreement covered the appeal of Manning's conviction. Soon there-

3. Despite a local bank having been named the alternative executor in the will, the record does not establish why the bank was not ap- pointed when Mr. Williams declined to serve, and no waiver on behalf of the bank was filed.

after, Ms. Roberts moved for a new trial, alleging that the prosecutor had had a sexual relationship with a prosecution witness that tainted the trial and the conviction. The record below does not reveal any evidence to support the allegation and was denied. While the motion did nothing to advance the appellate record, it did, however, damage any remaining goodwill between prosecution and Respondent.

Almost a year after the trial, in September 1999, Ms. Roberts filed a document titled Motion to Claim Surviving Child's Exemption in the probate case on behalf of Andrew Manning. The motion was eventually granted. In October 1999, Ms. Roberts also had both Manning and Andrew Manning execute documents in which each purportedly waived any right to object to Ms. Roberts' joint representation of the estate and Manning in his criminal case or to any other civil or criminal representation of Manning or Andrew Manning. Manning testified at his RCr 11.42 hearing that Ms. Roberts did not explain the waiver to him. Mr. Justice did not execute such a waiver.

Manning's conviction was eventually affirmed by this Court. *See Manning v. Commonwealth*, 23 S.W.3d 610 (Ky.2000). At some point afterward, Manning contacted the Commonwealth's Attorney, who at that time was about to become a circuit judge, to ask whether the five-year sentence was still on the table. In his later testimony, the Commonwealth's Attorney said that the offer was no longer available. He asked why Manning had not accepted the plea offer. According to the Commonwealth's Attorney, Manning told him that Ms. Roberts "suggested he not take it." He also told the Commonwealth's Attorney that Ms. Roberts "had a piece of the farm."

Around this time, Manning also began seeking post-conviction relief at both the federal and state levels. In 2003, he filed his RCr 11.42 motion alleging ineffective assistance of counsel. The basis for this claim was an alleged conflict of interest because the fee agreement with Ms. Roberts had essentially been a contingent fee arrangement. He claimed that her actions had been motivated by the knowledge that she would get paid only if she won an acquittal. Ms. Roberts wrote to Manning to tell him that his motion jeopardized his chance of getting a pardon from the governor. She told Manning that she would try to get him a pardon and mentioned that her son was marrying the governor's cousin.

Sarah Jost, an attorney for the state Department of Public Advocacy, stepped in to represent Manning in his RCr 11.42 motion. After several communications with Ms. Roberts about obtaining Manning's file, Ms. Jost moved the trial court to obtain access to the file. In her motion, Ms. Jost noted that under Kentucky law, the client owns the file and has a right to it at the end of the representation. Ms. Jost later testified that she had asked for the entire file, including any work product, but Respondent would not agree to give any of it to her. Ms. Roberts responded to the motion by claiming that Ms. Jost had not specified what she wanted from the file, which she claimed was voluminous. Respondent also claimed that Ms. Jost could obtain records from the court's file and that there was no basis for the RCr 11.42 motion. She stated at the 11.42 hearing that her unpaid fee for representing Manning was approximately $100,000 (based on about 1,000 hours of work), but that she did not expect to be paid.[4] At a hearing

4. It isn't clear how Respondent would have any expectation of being paid this amount. It

appears that the written attorney-client agree-

on the motion, Ms. Roberts stated that there had been a misunderstanding with Ms. Jost, in part, because of a concern that some of the file was subject to work-product privilege. The circuit court granted Ms. Jost's motion and ordered Ms. Roberts to make the file. available.

Six months later, the Warren Circuit Court held an evidentiary hearing on the RCr 11.42 motion, and in September, 2005, the court granted the motion and vacated Manning's conviction. Relying on *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Riggs v. United States,* 209 F.3d 828 (6th Cir.2000), the Court found Respondent entered into a *de facto* contingent fee agreement that comported with the two-prong actionable conflict test of *Cuyler.* Specifically, the court stated:

> A contingency fee agreement ... does not have to be labeled 'contingency fee agreement' before it will be construed as such. If it looks and functions like a contingency fee agreement, it is a contingency fee agreement. Here, the evidence shows that [Manning]'s attorney was to be paid, at least in part, from the sale of property that [Manning] would inherit from the murder victim's estate, which would occur only upon an acquittal.

> The Court ... finds that the fee agreement between [Manning] and his counsel was, in fact, a contingency fee.

This, the court held, created a conflict of interest, as it gave Ms. Roberts an incentive not to advise Manning to take a plea offer or to pursue certain defenses or offer mitigating proof that might result in a conviction for a lesser-included offense. That conflict played itself out with regard to the plea offer specifically in Manning's case. The court noted that Manning relied heavily on Ms. Roberts's advice, that he was not averse to plea negotiations, and that Ms. Roberts convinced him not to take the plea offer. The court concluded that this was ineffective assistance of counsel that prejudiced Manning, since he received a life sentence rather than the five-year sentence contemplated in the plea deal.

Manning later entered into a plea bargain in which he pleaded guilty to first-degree manslaughter in exchange for a ten-year sentence.

In June 2006, the Inquiry Commission issued a complaint against Ms. Roberts related to her representation of Manning in his criminal case. Ms. Roberts responded through counsel. Nevertheless, the commission issued a formal charge against Ms. Roberts in January 2008 alleging four ethical violations:

(1) SCR 3.130–1.4(b) for not discussing with Manning how she would be paid if he was convicted or how the contingent nature of the fee could affect his representation;

(2) SCR 3.130–1.5(d)(2) for entering into a contingent fee arrangement in Manning's criminal case;

(3) SCR 3.130–17(b) for representing Manning when her representation was materially limited by her own financial interest without the client's consent; and

(4) SCR 3.130–1.8(a) for acquiring a security interest or other pecuniary interest adverse to Manning without giving him a reasonable opportunity to first seek the advice of independent counsel.[5]

ments executed by Roberts and Respondent limited the attorney's fee to $27,500.

**5.** The rules referenced in the charge are those in effect prior to the substantial amendment that occurred July 15, 2009, though in many instances the language was not changed.

While those charges remained unresolved, the Inquiry Commission issued a second complaint against Respondent. The complaint resulted in a second set of disciplinary charges filed against Respondent in October, 2009. Those charges were:

(1) SCR 3.130–1.1 for not providing Manning with competent representation in his criminal case;

(2) SCR 3.130–1.7(b) for representing Manning, his brother Andrew Manning, Mr. Justice, and the estate in the probate action when that joint representation was materially limited by her competing responsibilities to these clients;

(3) SCR 3.130–1.16(d) for failing to take reasonable steps to make Manning's file available to his new counsel in his RCr 11.42 matter;

(4) SCR 3.130–3.2 for failing to make reasonable efforts to expedite the settlement of Earl Manning's estate; and

(5) SCR 3.150 and 3.130–3.4(c) for having revealed the existence of a pending bar complaint against her in April 2009, before she was allowed to do so.

Respondent, while serving as the estate's attorney, took no action in the estate matter from the years 2000 until late 2007. At that time, she filed in the record several letters sent or copied to Mr. Justice. Respondent filed no periodic inventories did not move to withdraw although two years had passed since Manning's 11.42 motion was successful.

Mr. Justice then hired new counsel to represent the estate, claiming he was no longer comfortable with Respondent's representation and was concerned about a possible conflict of interest. In March, 2008, Michael Reynolds entered his appearance on behalf of Mr. Justice as the executor of the estate. Soon after, the probate court ordered Mr. Reynolds substituted for Ms. Roberts as the estate's counsel. A warning order attorney was appointed for Manning's son, Jonathan Manning.

Jonathan, who would take in lieu of his father under the will, filed a claim seeking the entire real property in the estate. The realty was eventually sold by the Master Commissioner, who held a hearing of some type at which Mr. Reynolds, counsel for the estate, testified that he would not have undertaken multiple representations of Manning and his adoptive brother Andrew Manning, Mr. Justice, and the estate. He also claimed it was inappropriate for counsel for an estate to arrange and approve payment of an expert witness fee for the criminal defense of a putative heir of the estate, because such a fee was not a valid claim against or obligation of the estate. Nevertheless, Ms. Roberts was paid $4,000 for her earlier representation of the estate.

After the sale of the realty, Mr. Justice moved for a final settlement of and disbursement of funds from the estate. Ms. Roberts objected to the proposed final settlement, noting that several items, such as the $2,000 that had been paid for the ballistics expert, had not been included. She also stated that someone involved in the probate case had filed a bar complaint against her alleging a conflict of interest and failure to seek a timely settlement of the estate.[6] Ms. Roberts alleged that the bar complaint was an effort to avoid paying her various fees, including the fee for her representation of Manning in the criminal case and the complete fee in the probate matter, which she claimed totaled just over $10,000. In July 2009, the funds in the estate were disbursed and the estate

---

**6.** Based on the description of the complaint, this appears to have been a reference to the complaint that resulted in the formal charge in KBA file 17411.

was settled. Ms. Roberts was paid nothing more out of the estate.

Later that year, Ms. Roberts's two disciplinary cases were consolidated, and a trial commissioner was appointed. A hearing was held in September 2010. In April 2011, the trial commissioner filed her report finding Ms. Roberts guilty of all nine counts and recommending a one-year suspension. Ms. Roberts appealed, and the Board of Governors took up the case in March 2012.

The Board took de novo review of the case and found Ms. Roberts not guilty of seven of the charges and guilty of only two of the charges. Specifically, the Board agreed that Ms. Roberts had violated SCR 3.130–1.7(b) with her joint representation of all the parties in the probate matter and SCR 3.130–1.16(d) by not making Manning's criminal file readily available to his new counsel in his RCr 11.42 matter. Before deciding on a sanction, the Board was informed of Ms. Roberts's disciplinary history, which consisted of two private admonitions, one in 1993 for failing to reduce a contingency fee contract to writing and one in 2001 for improper ex parte contact with a tribunal. The Board recommended a 30–day suspension.

Both the KBA Office of Bar Counsel and Ms. Roberts have sought review by this Court under SCR 3.370.

## II. Relevant Law

Under our rules, the burden of proof shall rest upon the Association in a disciplinary proceeding, and the facts must be proven by a preponderance of the evidence. SCR 3.330. *Kentucky Bar Assn. v. Craft*, 208 S.W.3d 245 (Ky.2006); *Kentucky Bar Ass'n v. Heavrin*, 573 S.W.2d 916 (Ky.1978).

It is well settled that this Court conducts a *de novo* review of disciplinary cases brought before it. "The findings by the trial commissioner and the Board of Governors are advisory only; and, as such, we conduct an independent review of the record and alleged violations." *Kentucky Bar Association v. Blum*, 404 S.W.3d 841 (Ky.2013), citing *Kentucky Bar Ass'n v. Berry*, 626 S.W.2d 632 (Ky.1981). An earlier court, however, describes the action of the board of governors in disciplinary cases as "essentially a screening process." *Kentucky Bar Ass'n v. Franklin*, 534 S.W.2d 459, 463 (Ky.1976) (citation omitted). While we are charged with the responsibility of reviewing the facts and reaching our own conclusions in an attorney disciplinary case, the opinions, findings of fact, and conclusions of law may weigh on our own conclusions and should not be ignored.

The Board of Governors engaged in a long and thorough review of this case, and compiled a substantial record. SCR 3.370(5)(a)(ii) requires that when taking *de novo* review of a case, the Board must "state ... the difference between its findings and recommendations and the report of the Trial Commissioner." We note, however, that the submission of the Board of Governors did nothing to distinguish its conclusions from that of the Trial Commissioner. What was styled a Finding of Facts and Conclusions of Law, it actually did neither. The purpose of such a rule is plain. Given the complexities of the case as well as a myriad of legal issues presented, such a memorandum would have provided an invaluable guide. We understand that the Board is not an homogenous body and is expected to have differences of opinion, as doubtless their deliberations in the instant case demonstrates. But we have little, if any, insight into the reasoning of the Board of Governors in reaching its conclusions, and the noninclusion of such information diminishes the effectiveness of

the Board's work. We are certain that this was an inadvertent oversight by the Board of Governors. Our conclusions of fact and law on each charge follow.

### III. KBA File No. 13737 (Charges Filed January 15, 2008)

We first address **Counts 1 and 2.** In **Count 1,** KBA asserts that Respondent violated SCR 3.130–1.4(b) for not discussing with Manning how she would be paid if he was convicted or how the contingent nature of the fee could affect his representation. In **Count 2,** the Bar Association alleges that Respondent violated SCR 3.130–1.5(d)(2) by entering into a contingent fee agreement in a criminal case.

SCR 3.130–1.4(b), cited in **Count 1,** requires that a lawyer should "explain the matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

There are two components to **Count 1.** The first is that Manning wasn't told how Respondent's fee was to be paid. The second is that Respondent didn't disclose how one method of payment in this case—that she would be paid from the property received by Manning in the estate should he be acquitted—might impact the decision to go to trial.

The first component does not constitute a violation of the rule under these circumstances. The testimony below shows that the biggest issue seemed to be whether Respondent would be fully paid—not how Manning was going to pay it. The heart of this rule is that the client must be told how

the proposed legal representation will impact him, particularly the amount of fees that will be generated and how those fees are to be paid. The rule is there in part to require full disclosure of attorneys fees so the client knows what he is getting in to. In this case, Manning had little if any funds of his own. If there were an incomplete disclosure of the amounts of attorneys fees, it played little role here, and the client suffered no injury on this issue alone.

 The second component here—and the basis for **Count 2** of this file—is based on the assertion of a *de facto* contingency fee arrangement in Manning's defense. The claim is that Respondent would only get paid for Manning's criminal defense if he were acquitted. This is because KRS 381.280, Kentucky's "slayer statute," prevents the taking of benefits from a person's estate if the person were convicted of taking that person's life.[7]

It is clear that the purpose of the rule is to protect the judicial system from the taint of excess. A person's freedom should not be the subject of a roll of the dice by an attorney, and the judicial system was not designed as a roulette wheel.

There are competing facts in this case. What is clear is that Respondent tried to collect her fees and expenses in a number of ways, and as we have seen, her varied efforts to get paid were ongoing and numerous. While an acquittal would have greatly increased Respondent's chances of collecting her fee, that fact alone is insuffi-

---

7. KRS 381.280 essentially bars a person who kills another person from taking under the victim's will. It states, in pertinent part:

If the husband, wife, heir-at-law, *beneficiary under a will* ... takes the life of the decedent ... and ... is convicted therefor, the person so convicted forfeits all interest in and to the property of the decedent ... and

the property interest or insurable interest so forfeited descends to the decedent's other heirs-at-law, beneficiaries ... unless otherwise disposed of by the decedent. A judge sentencing a person for a[sic] offense that triggers a forfeiture under this section shall inform the defendant of the provisions of this section at sentencing.

cient to find that a contingent fee agreement existed.

We note, however, that Respondent appears to have refrained from giving advice to Manning about whether to go to trial. This is mystifying. Respondent's testimony below seems to be that she never gave her own opinion about potential trial outcomes. Rather, she let Manning make the decision. Advice is truly the stock in trade of an attorney, and why Respondent would not have offered it in a clear and cogent manner is perplexing.

Manning, however, had his *own* opinion about whether to go to trial. During his September 15, 2010 deposition, Manning told the bar association's counsel that he did not take the Commonwealth's offer because "... I didn't deserve no time for what I did." To make the point clear, Manning then repeated his testimony word for word. And later on in his testimony, this exchange occurred:

Q. ... Now, so it's really serious as a—as a criminal defendant, I mean, whether you take a plea bargain offer or whether you roll the dice and go to trial, you said's really important to you because it's your life?

A. Yeah.

Q. So who should make the call?

A. Me.

Q. And who did make the call?

A. Me.

Manning's answers establish that he wanted to go to trial, and he believed it was in his interest to do so. However the legal fee relationship is characterized, Respondent's representation of Manning was consistent with his intention and he clearly expressed a desire to "roll the dice" and take his case to trial.

In the case of a true contingency fee agreement, Respondent would have been obligated to try this case to a jury to seek a full acquittal. The accused would have been obligated to pay only if an acquittal resulted. The facts do not comport so neatly with such a *quid pro quo*. We not find by a preponderance of the evidence that Respondent entered into a true contingent fee agreement in her criminal defense of Manning, and accordingly, **Count 2 fails.**[8]

■ **Count 3** of KBA File 13737 charges Respondent with violating SCR 3.130–1.7(b)[9] for representing Manning when her representation was materially limited by her own financial interest without the client's consent. More specifically, KBA claims that the so-called contingent

---

**8.** While this issue is not before us, and noting the apparent clarity of SCR 3.130–1.5(d)(2), may a lawyer under *any circumstance* represent an individual where that person is the beneficiary of the will of the individual murdered? The rule would categorically require an answer in the negative. The purpose of this rule is ground in a public policy argument. And while it would seem that an appearance of impropriety would improperly taint the relationship, would a *per se* proscription of such an attorney-client relationship wrongfully impair the freedom of the accused to enter into a legal contract? If that the overarching ethical issues of transparency, disclosure and fairness are satisfied in an attorney-client agreement, could a criminal defendant argue that he has the absolute right to hire an attorney even though the agreement is a contingent-fee arrangement in cases where that is the only manner that would enable him to hire private counsel?

**9.** SCR 3.130–1.7(b), commonly referred to as the conflict of interest rule, then read as follows:

A lawyer shall not represent a client if the representation of that client may be materially limited by the ... lawyer's own interests, unless (1) the lawyer reasonably believes the representation will not be adversely affected; and (2) the client consents after consultation.

fee agreement impaired the nature of the relationship because the attorney's financial interests could only be satisfied through a dismissal of all manslaughter-related charges. Only if the client "consents after consultation," (SCR 3.130–1.7(b)(2), in effect prior to July 15, 2009), is such representation permissible. The record does not support this charge. Mr. Manning was aware of his legal and financial circumstance and he had ample opportunity to weigh his options. His testimony suggests that he had knowledge of how Ms. Roberts was to be paid and that he wanted to go to trial. A plea was not what Manning wanted, and the preponderance of the evidence shows that Respondent provided sufficient advice to the client. For these reasons, **Count 3** is dismissed.

■ **Count** 4 of File 13737 alleges that Respondent violated SCR 3.130–1.8(a) which requires that:

A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless … The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction.

We aren't sure how Respondent could have violated this rule. She did not engage in a business transaction with Manning, and never acquired an ownership or possessory or security interest of Manning. One of the agreements between the parties identified a mortgage interest, but no such interest was ever created. Technically speaking, Respondent did acquire a pecuniary interest just as every lawyer acquires a pecuniary interest in getting paid for services rendered. But we do not read this rule to require every attorney to ensure that his client has other counsel available to review that attorney's fee agreement. **Count 4** fails.

## IV. KBA File No. 17411 (Charges Filed October 7, 2009)

■ **Count 1** of File 17411 charges Respondent with violating SCR 3.130–1.1 which provides that:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The basis of the violation is that Respondent provided ineffective assistance of counsel because of the conflict of interest claim, as the Warren Circuit Court concluded in its 2005 order setting aside Roberts' manslaughter conviction. As we stated above, we do not believe that Respondent's agreement to defend Manning amounts to an actionable conflict of interest. There are competing interests in this case. We believe that the preponderance of the evidence shows that Manning wanted to go to trial and that he directed Respondent accordingly. Respondent did not have to represent Manning. But as a practical matter, there were not a whole lot of attorneys anxious to take a case where the likelihood of full payment was in question. Had Respondent not taken the case, it is likely that a public defender would have been appointed to represent Manning. The testimony in this case suggests that Respondent's zeal may have been at least a partial motive in her taking the responsibility of representing Manning in what was doubtless a very difficult case. There is also the issue of "shelf time" for Manning. KBA never established that Manning would have truly been better off by taking the five-year plea bargain. What we do know, however, is that Manning remained in prison even after the Rule 11.42 motion was sustained by the court in September, 2005, nearly eight

years after the indictment. So this suggests that the shelf time issue should have been a critical factor in deciding to go to trial. We come to a different decision than the learned trial judge who reversed Manning's conviction. We find that the alleged conflict of interest did not have an adverse impact on Manning's criminal case, and **Count 1 of File 17411** is accordingly dismissed.

■ **Count 2** charges Respondent with violating SCR3.130–1.7(b) by representing Manning; his brother, Andrew Michael Manning; and Russell Justice, the executor of the Earl Manning estate. The rule then read as follows:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person.

The Court has been hesitant to find ethical violations in most probate settings. Indeed, Rule 1.7 authorizes multiple representations where the representation is not adversely affected and the clients consent to the representation. Respondent obtained waivers from each of the Manning brothers and maintained that attorney-client confidentiality was never an issue between her, the executor and the Manning brothers.

The fact is that the interests of the Manning brothers were diametrically opposite because of Kentucky's slayer statute. Respondent could not have reasonably believed that the representation would not be adversely affected when one of the clients is on trial for killing the testator and a negative outcome in that case would bar that client from taking under the will. No waiver could make that conflict disappear. Moreover, Respondent prevailed on the executor to use estate funds to pay for expert witness fees in Manning's criminal defense. This was

clearly an unallowable use of funds from an estate where such an expenditure had nothing to do with the administration of the estate and where the outcome of who was entitled to the benefits of the estate was clearly in issue. It is noted also that the transaction was of financial benefit to Respondent as well. Had the estate not paid the bill, Respondent would have likely been obligated to pay it. We find that Respondent violated **Count 2 of File 17411.**

■ **Count 3** charges Respondent with violating SCR 3.130–1.16(d) by failing to make the Manning file available to new counsel. The rule states that:

Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

The charge addresses Respondent's conduct after learning of Manning's representation by Department of Public Advocacy attorney Sarah Jost, who was handling Manning's Rule 11.42 motion.

When Respondent was first contacted by Jost, her response was a suggestion that Jost obtain the court file as all pertinent documents were contained there. The DPA attorney was unsuccessful in convincing Respondent that the file, with some notable exceptions, belonged to the client and not Respondent. Jost was forced to file a motion in circuit court requiring Respondent to turn over the documents. The court predictably ordered

Respondent to do just that, and Respondent accomplished nothing but wasting time and delaying justice to Manning.

We can appreciate the fine line that may be drawn in distinguishing what belongs to the client and what is truly protected work-product of the attorney. If this were truly Respondent's concern, we might reach a different result here. Respondent, however, denied Jost complete access to the file, bringing the process to a standstill.

We note, too, that Respondent's conduct toward the Rule 11.42 process was defensive and petty and anything but professional. After learning of the filing, Respondent sent Manning a note warning him that the motion may jeopardize his chances of a pardon. She also stated that she believed (then) Governor Patton "will grant me an opportunity to talk to him about you on or before December, 2003," then added, "What do—you say way frivolous a motion?" [10]

It was clear that Respondent refused to cooperate with Jost, but Respondent's own testimony was colored by a generous lack of candor. Respondent claimed that Ms. Jost spoke with her on the phone only a single time and was unwilling to give her a reasonable time to prepare the file, points that were convincingly dispelled by Jost in her testimony. In addition, Respondent apparently ignored a written authorization for the file signed by Manning. Although the document was faxed to Respondent's office on January 28, 2004, Respondent still had not turned over the file when Ms. Jost filed her motion on February 19, almost three weeks later. We therefore find that Respondent violated **Count 3 of File 17411.**

Count 4 asserts a violation of SCR 3.130–3.2 by failing to make reasonable efforts to expedite the settlement of Earl Manning estate. The rule provides that an attorney shall make "reasonable efforts to expedite litigation consistent with the interests of the client." While the facts show that Respondent did not appear to be in any hurry to resolve the estate, it doesn't appear that anyone else was in a hurry, either. Neither the executor nor the heirs appeared to demand that Respondent take action with regard to the estate, and it is an open question as to whether the interests of the heirs were impaired by the estate remaining open. Respondent's conduct with regard to her irreconcilable conflict of interest has already been discussed, and while the celerity of the probate proceeding was less than speed of the much-heralded yet elusive neutrino, we find Respondent's conduct did not rise to a level of an ethical violation. Therefore **Count 4** is dismissed.

■ **Count 5** charges Respondent with violating SCR 3.130–3.4(c) by disclosing a pending bar complaint in a pleading filed in the Earl Manning Estate. The rule reads:

> All Participants in a proceeding under these Rules shall conduct themselves so as to maintain the confidentiality requirement of this Rule. Nothing in this Rule shall prohibit the Respondent from discussing the disciplinary matter with any potential witness or entity in order to respond to a disciplinary proceeding, *or to disclose to any tribunal,* or to disclose any information for the purpose of conducting a defense (emphasis added).

Respondent did disclose the pending bar complaint in a probate filing in April, 2009,

---

**10.** In Respondent's testimony at the hearing before the trial commissioner, she stated that "way" was a typographical error, and the word should have been "was."

when KBA's Complaint in File 17411 was indeed pending. But KBA, while seemingly conceding that the probate court is, in fact, a tribunal, argues that the probate court is not a tribunal as contemplated by the rule. KBA asserts that the provision only relates to a tribunal in which a court has inquired why counsel may be withdrawing. Such a precise and self-serving explanation should be lauded for its rich combination of creativity and hubris, but "any tribunal" would appear to mean "any tribunal," so **Count 5** is dismissed. KBA might wish to remember that this rule is intended to protect the attorney. It was not promulgated to provide the association an additional disciplinary tool against him.

### V. Sanctions.

In reading the record below and the facts which support our findings of guilt in **Count 2 of File 17411** (conflict of interest in estate representation) we observe in Respondent a failure to appreciate the reason for the rule: to make sure that all clients have a chance to be heard fairly. That would have been impossible when the interests of Manning and his brother are mutually exclusive., And representing the executor as well is impermissible given his responsibilities to his various constituencies. Moreover, directing the executor to pay an expert witness fee in Manning's criminal case is indefensible on any level.

In **Count 3 of File 17411** (failure to timely provide file to successor counsel), our concern is different. It suggests a defensiveness and arrogance that impeded Respondent's responsibilities to her client and to the Court. It also appears that Respondent failed to honor Manning's expressed intentions,[11] to advance his motion for relief under Rule 11.42. Respondent's

intentional foot-dragging delayed justice for Manning, and we conclude that this unnecessary delay was unjustifiable. We appreciate that valid questions may exist as to what may constitute protected material, and if there were truly unclear, first-impression issues, Respondent would have been better-served by a timely motion of her own with the circuit court. The record does not establish that such issues existed here in any case. Very simply, the client owns the file, and the issue of so-called protected work product is remotely secondary.

We also note Respondent's two prior informal reprimands. In common parlance, this is not Respondent's first rodeo. In determining the appropriate sanction, the disciplinary history of an attorney must be considered.

We also considered the testimony taken below by persons who are familiar with Respondent's character. Taken as a whole, the testimony shows that Respondent cares about her clients and takes on cases that many lawyers would pass on. Such enthusiasm may be admirable. But the record shows a lack of attention to detail that is somewhere between carelessness and recklessness that in this case impaired the interests of her clients.

As a result of these disciplinary violations, the Court's order is as follows:

1. Respondent shall be suspended from the practice of law for sixty-one days.

2. In accordance with SCR 3.390, and to the extent that she has not done so already, Respondent shall: (a) immediately, and to the extent possible, cancel and cease any advertising activities; and (b) notify all courts in which she has matters pending before it, and all clients for whom

---

11. Deriding Manning's 11.42 motion in a communication to the client as "frivolous" appears thoughtless and mean-spirited.

she is actively involved in litigation and similar legal matters, of her inability to continue to represent them and of the necessity and urgency of promptly retaining new counsel, and ensure that the interests of all clients are protected. Such notification shall be by letter duly placed in the United States mail within ten (10) days of the finality of this Opinion and Order. Respondent shall provide a copy of all such letters to the Office of Bar Counsel.

3. Respondent shall pay one-half of the $7,904.36 court costs incurred, or $3,952.18, and pay such amount in conformance with SCR 3.450:

ABRAMSON, CUNNINGHAM, NOBLE, SCOTT, VENTERS, JJ., DENNIS REPENNING, SJ. and J. CHRISTOPHER HOPGOOD, SJ., sitting. CUNNINGHAM, SCOTT, VENTERS, JJ., DENNIS REPENNING, SJ. and J. CHRISTOPHER HOPGOOD, SJ., concur. NOBLE, J., concurs in part and dissents in part in which ABRAMSON, J., joins. MINTON, C.J. and KELLER, J., not sitting.

NOBLE, J., concurring in part and dissenting in part.

The Respondent, Nancy Roberts, was charged with nine counts of misconduct related to her representation of Alan David Manning in a murder prosecution and of the estate of Manning's father. Among the allegations against her are that her fee agreement in Manning's criminal case was a de facto contingent-fee agreement which created a conflict of interest, that she had conflicts of interest in representing multiple parties in the probate of the estate, and that she failed to promptly turn over Manning's file to successor coun-

sel. The majority concludes that the contingent-fee allegations are unfounded but agrees that she had a conflict of interest in the representation of the estate and that she improperly failed to turn over Manning's file to successor counsel. Thus, the majority adopts the recommendation of the Board of Governors that Roberts be found guilty of only two ethical violations, but imposes a longer sanction (61 days instead of the recommended 30 days).

While I agree that the fee agreement was not, on its face, a contingent-fee agreement, it nonetheless operated very much like one and created the same conflicts of interest that a criminal-case contingent-fee agreement would. For that reason, I would find Roberts guilty of more than the two violations of the Rules of Professional Conduct recommended by the Board and would impose a longer suspension than that recommended by the Board or that imposed by the majority.

Before turning to the additional charges, I first must note that I agree with the majority that Roberts violated her ethical duties as to Manning's client file and in representing the estate. But I disagree with how the majority characterizes some of Roberts's conduct and fails to explain the full scope of her ethical violations, which are actually worse than described.

The allegation about releasing the file is unquestionably true. SCR 3.130–1.16(d) stated [12] (and still states) in relevant part: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as ... surrendering papers and property to which the client is entitled .... The lawyer may retain papers relating to the client to the extent permitted by other law."

---

12. Some of the Rules of Professional Conduct were amended substantially in 2009. Roberts's conduct was covered by the earlier version of the rules.

Despite this rule, Roberts acted as though the file belonged to her, not to the client, and that successor counsel's request for the file had been akin to a discovery request. Despite her claim that she was only obligated to turn over the client file to the extent reasonably practicable and even then only those parts of the file that the client is entitled to, Kentucky law is fairly clear that the file belongs to the client and must be turned over upon request at the end of the representation. Roberts claims that she understood the obligation to turn over "a copy of most of the file," but that she did not know what to do about "attorney work product." She also claimed that Manning's new counsel, Ms. Jost, spoke with her on the phone only a single time and was unwilling to give her a reasonable time to prepare the file. She ignores that a written authorization for the file, signed by Manning, was faxed to her office on January 28, 2004, yet she still had not turned over the file when Ms. Jost filed her motion on February 19, three weeks later. Three weeks was ample time to resolve the work-product issue and get a copy of the file to Manning's new counsel.

The majority notes that Roberts might have a point if her concern was with not turning over her own work product but that because she kept the *entire* file, she violated the rule. I disagree with the suggestion that Roberts was entitled to keep her work product.

While at least one Kentucky ethics opinion states that work product is excluded from what must be turned over to the client (while also stating that notes, memos, and research must be turned over), *see*

KBA Ethics Op. E–395 (March 1997), it is unclear why such material should be excepted. Work product is produced for the client. In other words, work product is one of the things the client buys from the lawyer.

While there are many policy reasons to have a limited work-product privilege in the context of discovery to bar opposing attorneys from obtaining it, those reasons are not present when the person seeking the work product is the person who hired the attorney to create the work product. Since the attorney is the agent of the client, arguably the client owns the work product, to which the attorney is entitled to keep only a copy. The current version of the rule distinguishes between work product and uncompensated work product, "*e.g.,* draft of pleadings, agreements and the like," SCR 3.130–1.16 cmt.10, and allows the withholding of such items "unless the client's interests will be substantially prejudiced without the uncompensated work product," *id.* This distinction makes more sense than the rule suggested in the majority opinion.

Similarly, the charge about Roberts's conflict of interest in jointly representing almost everyone involved in the probate case is also clearly supported by the evidence. SCR 3.130–1.7(b) stated that "a lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests . . . ."

Again, it is clear that representing the estate,[13] the executor of the estate, and

---

**13.** The KBA correctly notes that this is a misnomer because an attorney does not actually represent the estate, but instead represents the fiduciary representative or executor of the estate. *See* KBA Ethics Op. E–401, at 2 (Sept.1997) ("[A] lawyer who represents a fiduciary . . . stands in a lawyer-client rela-

tionship with the fiduciary and not with respect to the fiduciary estate or the beneficiaries." (quoting American College of Trust and Estate Counsel, *ACTEC Commentaries on the Model Rules of Professional Conduct,* 28 Real Property, Probate and Trust Journal 865 (1994))). The opinion later states, "In repre-

two of the heirs (one of whom was accused and eventually found guilty of killing the testator) creates a conflict of interest. Usually, an attorney for the representative of an estate is not also the attorney for the beneficiaries. Such an attorney owes duties only to the representative and does not have a fiduciary obligation to the beneficiaries. KBA Ethics Op. E–401, at 3 (Sept.1997). Multiple or joint representation is allowed but only under certain circumstances.

> A lawyer may represent the fiduciary of a decedent's estate ... and the beneficiaries of an estate ... if the lawyer obtains the consent of the multiple clients, and explains the limitations on the lawyer's actions in the event a conflict arises, and the consequences to the clients if a conflict occurs. Further, a lawyer may obtain the consent of multiple clients only after appropriate *consultation* with the multiple clients at the time of the representation.

*Id.* at 5. This requirement is based on SCR 3.130–1.7(b), which makes the conflict of interest rule inapplicable when the "lawyer reasonably believes the representation will not be adversely affected" and "the client consents after consultation." The consultation required by the rule "shall include explanation of the implications of the common representation and the advantages and risks involved." SCR 3.130–1.7(b).

First, Roberts could not have reasonably believed that the representation would not be adversely affected when one of the clients is on trial for killing the testator and a negative outcome in that case would bar that client from taking under the will. No amount of consent and consultation allows waiver of this limit. Roberts argues that Manning's and his brothers' interests were actually aligned because Manning would have been happy if his brother could inherit all of the assets. She notes that both claim to have been abused by their father and that their bond made their interests "perfectly synchronized." But the conflict extended also to Russell Justice, who supported the brothers but eventually came to see a conflict in Roberts's representing him and them.

Roberts's claim of no actual conflict (because all the parties supported each other) may be true, but it still seems a bit much given the circumstances. To be perfectly honest, the arrangement just does not quite pass the smell test. A good example, noted by the KBA, is the payment of money for Manning's expert witness. If Roberts represented the executor of the estate, she was required to advise him that the payments should not be made, as they were not an obligation or debt of the estate and they were to assist the accused killer of the testator. But she appears not to have done so.

Second, if joint representation is to be undertaken, all the parties must consent to the waiver and all the parties must be consulted at the beginning of the joint representation. It isn't clear that the consent was ever proper, since the Manning brothers' waivers were obtained well over a year *after* the joint representation appears to have commenced. Moreover, Justice never signed a waiver. And, when it

senting a fiduciary the lawyer's client relationship is with the fiduciary and not with the trust or estate, nor with the beneficiaries of a trust or estate." *Id.* at 5. The opinion also states that the attorney for the fiduciary should not claim to be the attorney for the estate to avoid confusion. *Id.* The distinction is important, because if the attorney representing the estate, then, like the executor, he might have fiduciary duties to the beneficiaries. But in Kentucky, the lawyer is the lawyer of the executor, not the estate itself, and thus any duties the attorney owes are to the executor. Still, the fourth employment contract stated that Roberts was hired to represent "the Estate of Earl Manning."

comes to the consultation requirement, the testimony is at least conflicting, with Manning at one point saying that Roberts discussed the conflict, albeit without going into detail, and later saying that he didn't know there was a conflict between himself, his brother, and the estate.

Thus, the evidence is sufficient to prove ethical violations on the two counts that the Board of Governors found. Even if Roberts's take on what happened is the better account of the facts, she still technically violated the rules. Whether she did so knowingly or intentionally or simply negligently goes to the weight of the violation, which can help determine the appropriate sanction but not whether she violated the rules. The Board appears to have thought that Ms. Roberts was well-meaning but at least negligent and taken that into account in recommending a sanction of only 30 days. The majority is apparently less impressed by this and thus has ordered a 61–day suspension.

Where I part from the majority is its decision that Roberts did not violate any of the other ethical rules. While I do not think the evidence would justify finding Roberts guilty on all the charges,[14] I think the proof supports finding that Roberts violated her ethical duties with respect to her competency in representing Manning in his criminal case and the fee arrangement for that representation.

As explained by the majority, the Warren Circuit Court granted Manning's RCr 11.42 motion and vacated his conviction. This alone suggests that Roberts's representation fell below the level of competency required by SCR 3.130–1.1.[15] Of course, the circuit court's reason for finding Roberts's representation to have been ineffective relates primarily to the conflict of interest allegedly created by the fee arrangement, but other proof supports a finding that her representation was less than competent under the circumstances. Witnesses testified that Roberts persuaded Manning not to take the five-year plea deal or that she was against any plea deal. Roberts herself admitted that she did not advise Manning to take the plea deal. Yet Manning was facing *life in prison*, which the jury ultimately gave him upon his conviction. And while Roberts claimed that she discussed the deal with Manning and implied that her lack of advice was based on his insistence that he was innocent, the trial commissioner, who heard the testimony firsthand, was nevertheless convinced by the witnesses who placed the blame for Manning not taking the deal squarely on

14. For example, the charges that Roberts violated SCR 3.150(3), and thus violated SCR 3.130–3.4(c), by revealing the existence of the bar complaint to the probate court before the Inquiry Commission had issued a charge could not be reinstated. The rules include an express exception for revealing the existence of a charge to a tribunal. The KBA argues that the exception "logically relates to the situation where a court inquires why counsel is withdrawing." Yet that is not what the rule says. Rather, "[n]othing in the rule shall prohibit the Respondent from discussing the disciplinary matter with any potential witness or entity in order ... to disclose to any tribunal." SCR 3.150(3). Quite plainly, the rule allows disclosure to a tribunal without qualification. Also, despite the KBA's argument

otherwise, the main thrust of the confidentiality is to protect the attorney, which is why the KBA must obtain the attorney's consent to disclose the information unless certain other conditions exist. This means Roberts acted properly when she disclosed the information, or at least did not violate any ethical rules, and the Board's decision with respect to this count was correct.

15. SCR 3.130–1.1 stated (and still states): "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

Roberts. That is sufficient to show that Roberts violated SCR 3.130–1.1.

But the most troubling issue is the nature of the fee arrangement between Roberts and Manning, which implicates SCR 3.130–1.5(d)(2)[16] directly and other rules indirectly.

The majority is simply incorrect that the purpose of these rules is to avoid the "taint of excess." The purpose of these rules is to avoid the conflict of interest that inherently results from a contingency-fee agreement in a criminal case. Such an agreement pits the lawyer's interest in getting an acquittal (to get paid) against the interests of the client, which might be best served by entering into a plea bargain.

Nonetheless, the arrangement, as laid out in the several employment agreements, was never expressly contingent on a result. Thus, to that extent, the majority is correct that it was not literally a contingent-fee agreement.

But the clear effect of the agreement, in light of the facts of Manning's position, was that it could be consummated *only* if Roberts won Manning's freedom. While her position is that she took the case with a charitable intent and anticipated that she would never be paid, the simple fact is that she still entered into an employment agreement that contemplated payment for her services. Worse still, the agreement contemplated payment after the fact from assets that had not and would not fully materialize until and unless Manning was acquitted because of the slayer statute. The agreements specifically refer to these assets, including those under the control of the named representative of the estate and the "timber" that existed on one of the properties that Manning stood to inherit. The payment was also secured by a prom-

issory note, which in turn was supposed to be secured by a mortgage. Though it is not clear what the mortgage was to be for, there is little doubt that it would be for the property that Manning would inherit. At best, Manning had an expectancy that turned on a condition precedent, namely, Roberts's winning an acquittal.·

The majority dismisses the promissory note because no mortgage was ever executed, but that does not change the fact that Roberts still had Manning execute the promissory note. This goes far beyond a standard lawyer engagement agreement.

And Roberts's own efforts to collect on the fee, or at least intimations about that fee, such as when she noted repeatedly to various people that she was owed about $100,000 for the representation, belies her claimed charitable motivation at least a little. As her own brief admits, the case was an "*almost* certainly free" one. (Emphasis added.)

The majority states that Roberts's failure to advise Manning about whether he should go to trial "is mystifying" and "perplexing." But the lack of advice is easily accounted for by Roberts's incentive under the fee agreements to seek only an acquittal for Manning and thereby make him eligible to take under his father's will. It's neither mystifying nor perplexing; rather, it's patently obvious why she failed to give him such advice.

In this light, the fee arrangement sounds suspiciously like a contingent fee in a criminal case. And the rule is not limited to actually collecting a contingent fee, which for obvious reasons did not occur here; it also prohibits a lawyer from entering into a contingent-fee arrangement in a criminal case. The policy behind this rule is very well illustrated in this case, at least

---

**16.** SCR 3.130–1.5(d)(2) stated and still states: "A lawyer shall not enter into an arrangement for, charge, or collect ... a contingent fee for representing a defendant in a criminal case."

if the circuit court's take on the facts in its RCr 11.42 order is correct. If Roberts entered into a contingent-fee agreement, then her only chance of getting paid was for Manning not to get *any* sort of conviction, including those resulting from a favorable plea bargain like that offered at the beginning in his case. This gave her an incentive to avoid a plea bargain and take the case to trial, where even a very small chance of winning (and thus getting paid) was better than the zero chance that came with a plea bargain.

The majority agrees with the argument by Roberts's counsel that the agreement did little more than any other attorney's agreement where payment is not made up front: it created a debt, calculated by the hourly rate in the agreement by the number of hours worked. Admittedly, that the likelihood of collecting on that debt was very low unless Roberts won the trial does not change the fact that the agreement created a debt. But this only shows that the agreement was not for a contingent fee on its face. That does not necessarily get Roberts off the hook, because we have to look at the effect of the agreement in light of the facts of the case.

The problem with the fee agreements is not that they included no up-front payment, though as every criminal defense attorney knows, you get paid up front. Rather, the problem with the agreements is that they specifically referenced getting paid from the proceeds of Manning's inheritance. I agree with the majority that had Roberts simply entered into the usual representation agreement, perhaps one providing she would be paid by the hour, then no conflict would have arisen, even if the chances of getting paid were near zero

without an acquittal. But Roberts went far beyond such an agreement and specifically linked her fee to Manning's inheritance.

Even if the representation agreement did not violate the letter of the contingent-fee rule, it still gave Roberts the same incentives to pressure Manning to take his chances at trial rather than taking the plea bargain. That the promissory note (referencing a mortgage) was executed by Manning is strong evidence of this conflict. At the very least, then, Roberts had a conflict of interest created by her own financial interest in Manning's case, which would violate SCR 3.130–1.7(b),[17] unless she consulted with Manning about the conflict. Yet there is little evidence to suggest that she did engage in such consultation.

Roberts argues that the promissory note is invalid on its face because several terms were left out (e.g., the amount of payments to be made). This, she claims, made the agreement illusory and was meant only to "bluff or encourage David [Manning] into paying" her. She also notes that no "fake mortgage" was ever drafted or executed because the note by itself was enough and because Manning owned nothing to mortgage. As to the agreement about the timber, she argues that the language in it was insufficient to satisfy the statute of frauds and claims that there was no marketable timber on the realty in the estate. This too, she argues, made that part of the agreement a "bluff."

If this was her intent, then her behavior was still unethical, though the charges may have described it incorrectly. Such bullying of a client is beyond the pale. Moreover, it further disproves her claim that she never expected to be paid and instead

---

**17.** SCR 3.130–1.7(b) stated: "A lawyer shall not represent a client if the representation of that client may be materially limited by the ... lawyer's own interests, unless: (1) The lawyer reasonably believes the representation will not be adversely affected; and (2) The client consents after consultation."

undertook the representation out of the kindness of her own heart and love and respect for Manning's mother. Indeed, that she took the case as charity is belied by the fact that she executed multiple agreements under which Manning obligated himself to pay her. If the case was *pro bono* from the start (or at any point), the representation agreements would have said so.

The simple fact is that Roberts undertook the representation with the expectation that she would get paid, or that she at least would try to get paid, and she knew that could happen only if she won the case and thereby allowed Manning to avoid the effect of the slayer statute, KRS 381.280. This is reflected in the various fee agreements she entered into with Manning, several of which expressly refer to money and real estate that Manning stood to inherit. While this was not an express contingent-fee agreement, it was a *de facto* contingent-fee agreement. And even if a *de facto* contingent-fee agreement was insufficient to violate the rules barring such agreements, Roberts's behavior in light of the circumstances of this case created the same conflicts of interest between Roberts and her client that an express contingent-fee agreement would. Despite her claims otherwise, she did not take this case as pure charity, and she knew she could get paid only if Manning were acquitted. This created a substantial, conflict of interest, especially given that the Commonwealth had offered a plea bargain by which Manning would only get five years in prison. By structuring the fee agreements as she did, Roberts removed any incentive to advise Manning to take such a favorable plea bargain. That violates the rules on conflicts of interest.

Perhaps this is all mitigated by the fact that the chances of Roberts's winning her case were so small. With the small chances of success, it is unlikely that the fee arrangement was part of some overarching master-plan pitting Roberts's financial interests against the liberty of her client. Unless she is the worst gambler in the world, it seems there must be some truth to her claims that she was motivated by compassion for Manning. Still, mitigation only goes so far, and a violation of the rules is exactly that and deserving of a sanction. At best, Roberts's good motives suggest that she should not be sanctioned as harshly as someone who intentionally takes advantage of a client.

At the very least, I would find that Roberts had additional conflicts of interest beyond those found by the majority. I would also find that Roberts's representation of Manning, specifically her failure to properly advise him about the proposed plea bargain, fell below the level of competence required of lawyers in the Commonwealth. Those additional violations call for a harsher sanction than that recommended by the Board of Governors and that ultimately adopted by the majority. That Roberts did not commit some of the violations found by the trial commissioner, however, suggests a shorter suspension than the one year recommended by the commissioner. Given the severity of Roberts's conduct and her disciplinary history, I would suspend her for 120 days.

ABRAMSON, J., joins.